[L. A. No. 24273.   In Bank.   Feb. 14, 1958.]

HARRY S. GORDON et al., Appellants, v. IRVING LANDAU, Respondent.

Joseph Stell and Herbert Murez for Appellants.

Harry A. Franklin for Respondent.

McCOMB, J.—From a judgment in favor of defendant, after trial before the court without a jury, in an action seeking (a) damages and (b) an injunction restraining defendant from soliciting plaintiffs' customers, plaintiffs appeal.

*Facts*: Plaintiffs are, and for about eight and one-half years have been, engaged in the house-to-house installment sales business. Their business is conducted by selling merchandise, generally to housewives in a low-income bracket at their homes, with either a down payment of $1.00 or $2.00, or with no down payment at all. Weekly installments of $1.00 to $2.00 are thereafter collected by plaintiffs through their collector-salesmen.

The collector-salesman has a dual task. He calls at the house of the customer each week on a scheduled day and collects the small installment payment due. At the same time he makes what, in the trade, are called "add-on sales," that is, sales of additional merchandise, the cost of which is added to the customer's account. The customer thus comes to rely on the plaintiffs, through the medium of their collector-salesman, as her supplier of the type of goods which plaintiffs handle.

Plaintiffs carry a line of general merchandise, such as clothing, household goods and appliances. Their customers are unique in that they are mostly persons in the low-income brackets, many of whom cannot afford to patronize more than one house-to-house credit installment supplier.

Plaintiffs have about 9000 accounts in Los Angeles County. Their customers are obtained by (1) reference from old customers, (2) canvassing of the various homes by plaintiffs' employees for the sole purpose of attempting to make initial sales, and (3) plaintiffs' purchasing accounts from companies

whose business it is to canvass homes and make opening sales on an installment basis.

Many customers make a single purchase and thereafter pay off the account. Some continue to buy, and these form the hard core of steady customers who have bought merchandise from plaintiffs for many years.

There is considerable turnover in the new accounts, but plaintiffs' regular customers can be counted on to buy month after month and year after year.

For the past several years, plaintiffs' cost of merchandise, plus cost of sales and collections, has been about 70 per cent of the gross sales price. After computing overhead, plaintiffs have made a net profit of approximately 10 per cent. A few hundred customers one way or the other would not materially raise or lower the overhead.

Defendant was employed by plaintiffs as a collector-salesman in November 1946 and was shortly thereafter assigned to a route. On each working day he was given a set of cards, on each of which appeared the name of a customer of plaintiffs on the particular route, the customer's address, a list of the merchandise previously bought by her from plaintiffs, and the amounts of payments for the period during which she had been a customer of plaintiffs. The card also showed the money balance due on the account and the name of the person who obtained or referred the customer in the first instance.

When the card indicated that the balance of the account and the credit rating of the customer warranted it, defendant would attempt to sell additional merchandise to the customer.

Customers relied on defendant's being at their houses one week from the day of his last call.

On March 4, 1952, plaintiffs and defendant executed a contract, which read in part:

"8. Collector-Salesman further agrees that during the period of one (1) year immediately after the termination of his employment with the Employer he will not, either directly or indirectly, make known or divulge the names or addresses of any of the customers or patrons of Employer at the time he entered the employ of Employer or with whom he became acquainted after entering the employ of Employer, to any person, firm or corporation, and that he will not, directly or indirectly, either for himself or for any other person, firm, company or corporation, call upon, solicit, divert, or take away, or attempt to solicit, divert or take away any of the customers, business or patrons, of the Employer upon whom he called or whom he solicited or to whom he catered or with

whom he became acquainted, or upon who he called or to whom he catered after his employment with said Employer.

"9. Collector-Salesman hereby consents and agrees that for any violation of any of the provisions of this agreement, a restraining Order and/or an injunction may issue against him in addition to any other rights the Employer may have.

"10. In the event that the Employer is successful in any suit or proceeding brought or instituted by the Employer to enforce any of the provisions of the within agreement or on account of any damages sustained by the Employer by reason of the violation by the Collector-Salesman of any of the terms and/or provisions of this Agreement to be performed by the Collector-Salesman, Collector-Salesman agrees to pay to the Employer reasonable attorneys' fees to be fixed by the Court."

Defendant terminated his employment with the plaintiffs on July 25, 1954. Shortly thereafter he started operating the same type of business for himself, selling the same kind of merchandise. He went along his old route and methodically visited the customers of plaintiffs whose names, identities and locations he had learned and whose acquaintances he had made during and by reason of his former employment with plaintiffs.

With a few exceptions, he visited these customers without any prior invitation or request on their part to do so. He advised them that he was then engaged in the same business for himself and solicited their trade.

With the knowledge which he had acquired from plaintiffs' customer cards, he asked, suggested and urged customers to buy merchandise from him on the same installment basis. After he had made sales, he would call on the customers regularly each week, collecting the weekly installments and making substantial add-on sales. His ability to make such sales was greatly facilitated by his having sold the customers merchandise during his employment with plaintiffs. He sold goods to 117 former customers of plaintiffs in the amount of $6,752.89.

The trial court found in favor of defendant, holding that the contract which the parties had entered into was invalid.

█ This is the single question necessary for us to determine: Was the contract entered into between plaintiffs and defendant invalid for the reason, as contended by defendant, that (i) there was no consideration for it; (ii) it was too vague and uncertain to be enforceable; (iii) there were no wages or conditions of employment specified in it; or (iv) it had an unlawful object and was therefore void under the

694

provisions of section 16600 of the Business and Professions Code?*

This question must be answered in the negative for these reasons:

(i) There was consideration for the contract, in that plaintiffs agreed to and did employ defendant in consideration of his executing the contract, a portion of which is set forth above.

(ii) A reading of the contract discloses that it is neither vague nor uncertain.

(iii) The contract specifically provided for the payment of a weekly salary and commissions by plaintiffs to defendant.

(iv) The contract did not restrain defendant from engaging in a lawful profession, trade or business within the meaning of section 16600 of the Business and Professions Code.

It clearly appears from the terms of the contract that it did not prevent defendant from carrying on a weekly credit business or any other business. He merely agreed not to use plaintiffs' confidential lists to solicit customers for himself for a period of one year following termination of his employment. Such an agreement is valid and enforceable. (*Gordon v. Wasserman*, 153 Cal.App.2d 328, 330 [314 P.2d 759] [hearing denied by the Supreme Court]; *Handyspot Co. v. Buegeleisen*, 128 Cal.App.2d 191, 195 [6] [274 P.2d 938]; *King v. Gerold*, 109 Cal.App.2d 316, 318 [2] [240 P.2d 710].)

■ The uncontradicted evidence shows that defendant sold goods to at least 117 of plaintiffs' preferred customers and in doing so used plaintiffs' lists entrusted to him while he was in their employ. Plaintiffs' preferred customers are a real asset to their business and the foundation upon which its success, and indeed its survival, rests. It thus logically follows that a list of such customers is a valuable trade secret and that plaintiffs were damaged by defendant's unlawful use thereof. (*California Intelligence Bureau v. Cunningham*, 83 Cal.App.2d 197, 203 [4] [188 P.2d 303]; cf. *Aetna Bldg. Maintenance Co. v. West*, 39 Cal.2d 198, 204 [8] [246 P.2d 11].) Plaintiffs were therefore entitled to have damages found and assessed in their favor. They may recover for *all* damages proximately caused by defendant's wrong. (*Gordon v. Schwartz*, 147 Cal.App.2d 213, 216 [1] [305 P.2d 117].)

*Section 16600 of the Business and Professions Code reads: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

In view of the fact that more than a year has passed since defendant left plaintiffs' employ, by the very terms of the contract the time has elapsed during which plaintiffs would be entitled to obtain an injunction against defendant restraining him from using the lists of their customers.

The judgment is reversed with directions to the trial court to take evidence and make a finding as to the amount of damages suffered by plaintiffs and to enter judgment accordingly.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.