[Civ. No. 40573. Second Dist., Div. Five. Nov. 19, 1973.]

TEXACO, INC., Cross-complainant and Appellant, v.
PETROLEUM SPECIALISTS CORPORATION,
Cross-defendant and Respondent.

## COUNSEL

Schell & Delamer, Fred B. Belanger, Ellis J. Horvitz and Arthur E. Schwimmer for Cross-complainant and Appellant.

Sikes, Pinney & Matthew and Leon A. Pinney for Cross-defendant and Respondent.

## OPINION

**HASTINGS, J.—**

### FACTS

Texaco, Inc., appellant (hereinafter Texaco), is owner of the modern "supertanker," the *SS Texaco Montana*. On July 4, 1967, the ship was docked in the Los Angeles Harbor, at Wilmington, California, to discharge its cargo of fuel. Texaco had a contract with respondent, Petroleum Specialists Corp. (hereinafter PSC), providing that said company would discharge cargoes from Texaco tankers in Los Angeles (Wilmington) and Long Beach Harbors. In practice, when a Texaco vessel docks, PSC's crew (approximately seven men on this occasion) replaces the vessel's crew. On the above date, the PSC crew went aboard the *Texaco Montana* at 4 p.m., and the ship's crew disembarked from the vessel. William Skinner, president of PSC, was in charge of this crew, which included Charles Bays (hereinafter Bays), an experienced pumpman and seaman. The only "or-

ders" from Texaco to which PSC's crew were subject were the written instructions from the ship's chief mate outlining the sequence in which the vessel's tanks were to be discharged. At all times pertinent hereto, the ship and the PSC personnel on it were under the control and supervision of PSC's president, and Texaco did not interfere with PSC's operations. It was stipulated at the trial that Bays was doing seaman's work.

The *Texaco Montana* has nine sets of cargo tanks, numbered consecutively from front (fore) to the rear (aft). Thus, the number 8 tanks are aft. Cargo is discharged by being pumped through pipelines connected near the bottom of each tank. The main cargo valve through which the bulk of the cargo is removed is operated by a valve wheel on the main deck. The pipelines run from the tanks to the pumps that are located in a pump room near the rear (aft) of the ship. Attached to each set of tanks on the main deck is a drop valve. Though generally not used to discharge cargo, it can be used during discharge operations to assist in restoring prime to a pump.

On July 5, 1967, at approximately 4 a.m., Bays was discharging cargo from number 8 port tank when the main cargo pump began to speed up. Bays was familiar with the racing sound and knew that the pump had lost, or was losing, its prime (running dry). The pump is lubricated by the liquid flowing through it. A dry pump overheats and can burn up, or cause an explosion. This can happen quickly, so, according to Bays, he had to act immediately to bring liquid to the pump, thus restoring its prime.[1] One customary and accepted method to restore prime to the pump is to perform an operation called a "flying switch." This involves two persons. To accomplish it on the pump that had lost its prime, one person must close the number 8 port tank's main suction valve while the other man opens the number 8 drop valve, which would drop fuel back into the lower lines and through to the pump. The opening and closing of valves is done by hand. Bays decided to perform the "flying switch" with another employee of PSC, one Mr. Pollock (hereinafter Pollock), who had just finished discharging cargo from the number 8 starboard tank and was nearby. Pollock closed the main suction valve, and Bays tried to open the drop valve but it was jammed. According to Bays, when he found he could not turn the valve wheel, which was about three feet in diameter, he stepped to the side of the wheel, grabbed the top of it with both hands, put the heel of his foot on one of the bottom spokes,

---

[1]Bays testified that it would take only "a matter of seconds" after the pump ran dry for it to be endangered. Another witness testified that damage to a pump would begin at the end of about a minute after it ran dry.

and with great effort opened the valve. When the valve "cracked open," he felt pain through his leg and back, but he proceeded to complete the "flying switch" and restored prime to the pump. He then continued working until his 16-hour shift ended at 8 a.m.

Bays sued Texaco on claims of unseaworthiness[2] and negligence. Texaco cross-complained against PSC for indemnity for any damages Bays might recover against it. The jury returned a general verdict in favor of Bays against Texaco for $60,000 and also returned a general verdict (denying indemnity) in favor of PSC against Texaco. Texaco appeals from the judgment in favor of PSC.

ISSUES

I.

Texaco contends the evidence is insufficient to support the verdict and judgment for the following reasons:

A. Federal maritime law is controlling, and under said law PSC contractually owes Texaco a duty of workmanlike performance.

B. Bays was contributorily negligent, and this constituted a breach of PSC's warranty of workmanlike performance.

1. Bays' contributory negligence may be inferred from the amount of the jury award of damages.

2. The evidence compels a conclusion of contributory negligence on Bays' part, and this is imputed to PSC as a matter of law.

C. Independent of Bays' negligence, PSC breached its warranty of workmanlike performance by failing to instruct its employees with respect to safety precautions.

D. The evidence was insufficient as a matter of law to establish conduct on Texaco's part sufficient to preclude indemnity.

II.

Texaco contends that, assuming the evidence was sufficient, Texaco is entitled to a new trial because the court committed reversible error in instructing the jury.

[2]The doctrine of seaworthiness, which protects longshoremen (as distinguished from their employer, the stevedore company) as well as seamen, imposes upon a shipowner the duty to furnish a vessel and appurtenant appliances and equipment reasonably fit for their intended use.

ARGUMENT

I.

A. Both parties agree that federal maritime law is controlling, and that PSC had a duty to perform its services in a workmanlike manner. From this point of departure, however, each steers a different course. Texaco cites numerous cases establishing the principle that the contract between the shipowner and a stevedore company carries with it a warranty that the work performed by the stevedore company will be done properly and safely. A breach of this warranty entitles the shipowner to indemnity where the shipowner has paid damages for an injury sustained by a stevedore working on the ship, although unseaworthiness of the vessel also played a part in the accident causing the injury. (*Italia Soc.* v. *Ore. Stevedoring Co.* (1964) 376 U.S. 315 [11 L.Ed.2d 732, 84 S.Ct. 748]; *Crumady* v. *The J. H. Fisser* (1959) 358 U.S. 423 [3 L.Ed.2d 413, 79 S.Ct. 445]; *Weyerhaeuser S. S. Co.* v. *Nacirema Co.* (1958) 355 U.S. 563 [2 L.Ed.2d 491, 78 S.Ct. 438]; *Ryan Co.* v. *Pan-Atlantic Corp.* (1956) 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232].) A recent California case, *Standard Oil Co.* v. *Intrepid, Inc.*, 26 Cal.App.3d 135 [102 Cal.Rptr. 604], summarizes the numerous cases and states at pages 139-140: "The preceding principles establish that the duty of workmanlike performance is, in effect, a form of strict liability which is imposed upon the contractor by law in case he breaches the implied term of the contract. . . . Under what is now well established federal maritime law, the shipowner is precluded from recovery in an indemnity action *only if its conduct prevented or seriously handicapped the contractor in performing a workmanlike job* [citations]." [Italics in original.]

PSC counters this argument by denying any negligence on its part or any conduct that would be a breach of its warranty. As a separate defense, however, assuming negligence on PSC's part, it cites the law enunciated in *Humble Oil & Refining Co.* v. *Philadelphia Ship Main. Co.*, 444 F.2d 727, that negligence on its part does not, in and of itself, establish a breach of workmanlike service; and if a vessel's unseaworthiness prevents the stevedore's workmanlike performance, a jury is to determine if the conduct on the part of the shipowner is sufficient to preclude recovery for indemnity. See also *Delaneuville* v. *Simonsen*, 437 F.2d 597; *Hagans* v. *Farrell Lines*, 237 F.2d 477; *Atlantic & Gulf Stevedores, Inc.* v. *Skibs A/S Danmotor*, 342 F.Supp. 837.

We turn to Texaco's specific arguments alleging conduct by Bays and PSC that caused the breach of PSC's warranty of workmanlike service.

## B. Bays was contributorily negligent.

■ 1. Texaco states that contributory negligence on PSC's part can be inferred because of the size of the jury award. This theory unfolds as follows: The doctrine of comparative negligence is applicable to maritime cases; the California Supreme Court has recognized that a jury verdict for less than all of the damages proved indicates a finding that both parties were at fault; that the jury award here to Bays barely covered his past expenses and loss of earnings, allowing virtually nothing for pain and suffering, permanent disability or future loss of earnings; that the doctrine of comparative negligence does not apply to its action for indemnification, and if PSC is guilty of contributory negligence (through Bays' negligence), it must indemnify Texaco because it is a breach of its warranty of workmanlike performance.

The key "domino" in this concept is that a jury award to Bays for less than all of his damages indicates a finding that both parties were at fault. *Intagliata* v. *Shipowners & Mer. etc. Co.* (1945) 26 Cal.2d 365 [159 P.2d 1], is cited by Texaco as establishing this rule. This case involved a collision between a tugboat and a fishing boat, and although the collision was in inland waters in California and the case was tried in a state court, it was held that federal maritime law was controlling, thereby invoking the rule of comparative negligence. The court stated at page 369: "Plaintiff's damages consisted of expenses incurred in repairing his boat and replacing the engine and nets, and of loss of earnings. The jury's verdict was for only part of the damages, indicating that it found both parties at fault. It was instructed to apply section 292(c) of the California Harbors and Navigation Code, which provides that if both parties to a ship collision are at fault 'the loss shall be equally divided, unless it appears that there was great disparity in fault, in which case the loss shall be equitably apportioned.'" This statement is found early in a lengthy opinion, and immediately following is a detailed statement of facts leading up to a discussion of the applicable law. In context it is dictum, but Texaco is seeking to utilize it as establishing the aforementioned rule of law. Standing alone, we cannot accept the proffered theory since, fundamentally, there are too many variables involved in a jury's general verdict to allow us to speculate on the reasons upon which it is based. Although the jury instructions give certain guidelines, it is nigh impossible to know how the jury applied its discretionary powers without the use of a special verdict or findings. Some of the variables in this case are good examples: medical expenses, $4,846.38; evidence that

Bays was a licensed real estate salesman before and after the accident, thus not deprived of a livelihood; conflicting evidence on his average earnings; contradictory evidence as to whether Bays was or was not permanently injured; medical records showing history of prior medical disabilities, generally an influencing factor.

Conceivably, there could be a jury award where the reviewing court could conclude as a matter of law that its verdict for less than proven damages implies contributory negligence. However, it would have to be on clear and convincing evidence. It could also be argued with a degree of logic that such speculation is seldom warranted, because Code of Civil Procedure section 625 providing for a special verdict gives to counsel the tool for clarifying the jury verdict.

2. Texaco claims that the evidence compels a conclusion that Bays was contributorily negligent. In support of this argument, Texaco cites evidence that Bays was an experienced pumpman; that he had previous experience opening stuck valves with wheel wrenches but, in spite of this, did not know where the valve wrenches were kept on the *Texaco Montana,* nor did he consider it his responsibility to know; that according to his coworker he struggled to open the valve for about five minutes.[3] From this evidence, Texaco concludes that Bays was contributorily negligent because he did not choose any of the following alternatives: (1) run to the pump room and turn off the pump; (2) obtain assistance from Pollock; (3) obtain a wheel wrench; (4) "Mr. Bays never asked Mr. Pollock to report the situation to Mr. Skinner."

While there is a conflict in the evidence as to the time required to open the valve, both Pollock and Bays agreed that the "flying switch" is to be done with split-second timing. It is well established that the appellate court is required to consider the evidence most favorable to the prevailing party, giving him the benefit of every reasonable inference and resolving conflicts in support of the jury verdict. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4236.) Thus, we conclude there was substantial evidence from which the jury could

[3]There is conflict between the testimony of Pollock and Bays. Bays, when asked how long he worked on the valve wheel, replied, "That's rather difficult; just a matter of a second because we were in a great hurry to get the prime back on that pump." Pollock's testimony was that he was looking into the tank through the ullage hole for "maybe a couple of minutes" while Bays was working on the drop valve, then he looked up at Bays and then looked down again "maybe two or three minutes" for a total of at least five minutes, during all of which time Bays was struggling to open the drop valve.

determine that Bays treated the problem as an emergency, and, being an experienced pumpman, that he acted appropriately under the circumstances. The cases cited by Texaco are in no way a mandate to us that we must find contributory negligence as a matter of law.

It is not necessary to discuss Texaco's next argument that the negligence of an employee is imputed to his principal, in light of our decision that Bays' contributory negligence has not been established.

■ C. Texaco maintains that PSC, independent of Bays' negligence, breached its warranty of workmanlike performance by failing to instruct its employees with respect to safety precautions. The essence of this assertion is that the stevedore enjoys a special expertise with regard to loading and unloading operations, and is the party best situated to adopt preventive measures when an unsafe condition comes into play during the loading or unloading of a ship. (*McInnis* v. *Hamburg American Lines* (N.D.Cal. 1970) 317 F.Supp. 1395, 1397; *Italia; Ryan; Weyerhaeuser; Standard Oil; supra.*) Therefore, because the stevedore is best situated to adopt preventive measures, failure to instruct its employees about safety precautions is conduct on its own behalf which establishes breach of workmanlike performance.

PSC had not conducted any meetings with regard to safety procedures that should be used when employees encounter unsafe conditions, nor given instructions on action to be taken in the event they are faced with a stuck valve. Texaco concedes in its opening brief that Bays had worked as a pumpman since 1958 and had previous experience in handling stuck valves; that there was testimony to the effect that he was the best pumpman PSC had. Thus, it is a question of fact whether under these circumstances PSC was required to give him lessons on precautions to utilize in the problem facing him here. In view of Bays' expertise, there is substantial evidence to support the jury's verdict that lack of safety instruction was not a breach of its warranty of workmanlike performance.

■ D. Texaco's last contention on the issue of workmanlike performance is that the evidence was insufficient as a matter of law to establish conduct on its part sufficient to preclude indemnity. The thrust of this argument is that, conceding Texaco supplied defective equipment, even to the point that it constituted both unseaworthiness and negligence, it is an immaterial breach and will not preclude indemnity. This theory, Texaco urges, is a composite of the law from the cases cited earlier (*Ryan* et al.)

to the effect that the stevedores' warranty of workmanlike performance is treated by the courts as a species of strict liability.[4]

■ It is not necessary to review the cases cited by Texaco because recent cases have also established that where there is negligent conduct by both the shipowner and the stevedoring company, the question of indemnity is a weighing process by the trier of fact to determine the relative materiality of the alleged breaches of the contractual obligation owed by the two parties.

We conclude that the law applicable to the case at bar is logically spelled out in *Humble Oil, Delaneuville, Hagans,* and *Atlantic, supra.* In *Humble Oil,* plaintiff, a longshoreman employed by a stevedoring company, was aboard a Humble Oil ship loading cargo. In order to load the cargo (in crates), the stevedores removed the lower of two protective chains on the ship. The upper chain was rusted and frozen and could not be disconnected. One crate lodged against that chain, and while attempting to free the crate, plaintiff stevedore permanently injured his back. He sued Humble Oil (shipowner) and it, in turn, sought indemnity from the stevedore company. The court analyzes *Ryan, Italia, Weyerhaeuser,* and most of the cases cited by Texaco and states at pages 730-733, inter alia: "A new course was charted in Ryan Stevedoring v. Pan-Atlantic S.S. Corp., . . . in which the court found nothing to preclude the stevedore from contracting with the shipowner to indemnify it for any claims upon which injured longshoremen might recover against the shipowner or the vessel *in rem.* . . .

"In Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), the Supreme Court, again faced with facts indicating that the stevedore was substantially responsible for a longshoreman's injuries, reaffirmed the shipowner's right to indemnification created in *Ryan,* but not without reservation: 'If [the stevedore] rendered a substandard performance which led to foreseeable liability of [the shipowner], the latter was entitled to indemnity *absent conduct on its part sufficient to preclude recovery.*' . . . (emphasis supplied). . . ." The court then said: " The inapplicability of negligence principles, however, is a two-edged sword. A specific finding of negligence does not necessarily establish

[4]Other supporting cases cited are *Crumady* v. *The J. H. Fisser, supra,* 358 U.S. 423; *Drago* v. *A/S Inger* (2d Cir. 1962) 305 F.2d 139, cert. den. 371 U.S. 925 [9 L.Ed.2d 232, 83 S.Ct. 292]; *Calmar Steamship Corp.* v. *Nacirema Operating Co.* (4th Cir. 1959) 266 F.2d 79, cert. den. 361 U.S. 816 [4 L.Ed.2d 62, 80 S.Ct. 56]; *Italia Soc.* v. *Ore. Stevedoring Co., supra,* 376 U.S. 315; *Mortensen* v. *A/S Glittre* (2d Cir. 1965) 348 F.2d 383.

a breach of warranty, and indemnity may be refused. [Citations.] As stated in Waterman Steamship Corp. v. David, 353 F.2d 660, 662 (5th Cir. 1965): 'If a vessel's unseaworthiness prevents the stevedore's workmanlike performance, that is "conduct" on the part of the shipowner "sufficient to preclude recovery" and to excuse even a negligent breach by the stevedore.' [Fn. omitted.] . . .

"The reasonableness of the stevedore's actions must not be evaluated in isolation. Whether the shipowner has created conditions which so impede the stevedore's performance that his breach may be excused *is a weighing process,* Waterman Steamship Corp. v. David, *supra, peculiarly within the province of the factfinder.* Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 792 (1962). [Italics added.] And if the jury concludes that the stevedore is free from all responsibility for a longshoreman's injury, no indemnity may be found as a matter of law. International Terminal Operating Co. v. N. V. Nederl. Amerik Stoomv. Maats., 393 U.S. 74, 75, 89 S.Ct. 53, 21 L.Ed.2d 58 (1968)."

▮ We, again, are forced to return to the general verdict of the jury in this case. We are in accord with the principle stated in *Humble Oil,* that the reasonableness of the stevedore's actions and whether the shipowner had created conditions which so impeded the stevedore that his breach may be excused are issues of fact and peculiarly within the province of the jury.

Evidence was presented that the chief mate on the *Texaco Montana* intentionally closed the drop valves in a secure manner, requiring a wrench in order to open them. The wrenches for this purpose were left on the manifold in the middle of the ship, approximately 200 feet away from the stuck valve. However, he could not remember if they were there at the time of the accident. He admitted leaving no instructions or other information that would put PSC on notice that wrenches were needed to open the drop valves. There was testimony on behalf of PSC that the drop valves should open easily by hand if properly maintained. Texaco concedes in this argument that the valve was stuck. From the evidence, the jury could have found that Texaco had created an unseaworthy condition that so impeded Bays' performance that the breach, if any, of workmanlike performance by PSC may be excused.

## II.

▮ Texaco urges reversal because the trial court failed to read a portion of one jury instruction and failed to give nine of Texaco's proposed

instructions. Two of Texaco's requested instructions on indemnity were given, one as requested and one as modified by the court, one sentence of which was inadvertently not read to the jury. Texaco's principal requested instruction (No. 13), fully spelling out the duties of both parties under the contract, was given in its entirety. Texaco's other requested instruction (No. 22) was:

"Negligent conduct of plaintiff, if any, is to be considered by you in determining whether or not there was a breach of warranty on the part of his employer Petroleum Specialists.

*"Petroleum Specialists warranted to Texaco that its working men would not be negligent.*

"Knowledge of a person such as plaintiff, if any, of a defective condition of ship or equipment is imputable to an employer-contractor such as Petroleum Specialists." (Italics added.)

The court failed to read the second, emphasized sentence. Texaco claims that the omission permitted the jury to find that PSC did not breach its warranty of workmanlike performance, even though the jury believed Bays was negligent. We disagree. The jury was told in the first paragraph of the instruction that negligent conduct by Bays was to be considered in determining breach of warranty. The omitted sentence was unnecessary and even confusing, as it implies liability on PSC's part without considering the effect of the ship's unseaworthiness. The instruction as given was not prejudicial error.

■ The giving of PSC's requested instruction No. 3[5] did not compound the alleged error, as Texaco contends. Texaco argues that it is a proper statement only in the absence of contributory negligence, and claims it consented to its reading depending on the full reading of instruction No. 22. This argument is without merit. Instruction No. 3 is a correct statement of the law (*Delaneuville* v. *Simonsen, supra,* 437 F.2d 597;[6]

---

[5]"If you find that the contractor PETROLEUM SPECIALISTS continued to work after having learned of an unseaworthy condition, it is for you to decide whether such continuance of work was reasonable under the circumstances and if you do so find, then the shipowner TEXACO is not entitled to indemnity from the contractor on that basis."

[6]*Delaneuville* v. *Simonsen, supra,* forcefully illustrates the need for time to correct an unseaworthy condition. An emergency generally precludes such corrective action. The court states at pages 601-602: "It is true that once a stevedore is placed on notice that a defective condition exists aboard ship, it must take immediate affirmative action to correct it, and to make the ship safe for its intended use. [Citations.]

*Judith Ann Liberian Transport Corp.* v. *Crawford,* 399 F.2d 924, 926), and the fact of possible contributory negligence would be considered in determining whether continuing to work was reasonable.

■ All of the remaining requested instructions of Texaco were properly refused by the trial court. The gist of these instructions was that even though the jury found that Texaco was negligent and created an unseaworthy condition, this did not relieve PSC. Each instruction implies that the jury must find in favor of Texaco, excluding from its consideration the materiality of Texaco's conduct, as spelled out in *Humble Oil* et al., cited earlier.[7]

■ In conclusion, Texaco argues error because of the last two questions read to the jury in a "suggested agenda" given by the court on its own motion. In substance, the jury was asked to determine if Texaco failed in a material respect to perform its obligations to PSC; if the jury answered in the affirmative, it then was asked if such breach was a proximate cause of Bays' injuries. Texaco insists this is not the law and claims the first question misled the jury. We do not concur. The court was emphasizing need for a material breach by Texaco, which would place it within the doctrine established by earlier cited cases. We refer to two cases in point.

In *Hagans* v. *Farrell Lines* (3d Cir. 1956) *supra,* 237 F.2d 477, the court stated at pages 480, 483: "We think it a necessary conclusion from the question addressed to the court by the jury, and the general verdict, that the jury must also have concluded that the defective winch was the *substantial cause* of the accident, and that the negligence of Lavino's employees was not a substantial cause of the accident. . . . If anything, Lavino only contributed to the happening of the accident." (Italics added.) And in *Waterman Steamship Corporation* v. *David,* 353 F.2d 660, we find the following statement at page 666: "Our task is not to decide whether the S. S. ARIZPA'S unseaworthiness was a *sufficient material breach* of

---

But this is not met for want of (i) notice or constructive notice [fn. omitted] and (ii) an opportunity for correction. For whatever may be the status of 'instantaneous unseaworthiness' *vis-à-vis* Shipowner and Sieracki seaman [fn. omitted] in order for the stevedore to be held liable for indemnity for an accident that occurs subsequent to its discovery of the defective equipment, the stevedore must have sufficient time between the discovery and the accident to correct the defect. [Citation.]"

[7]The instructions rendered PSC liable, in spite of Texaco's negligence, if PSC (a) brought the unseaworthy condition into play; (b) continued to work after knowledge of the defect; (c) could have eliminated the risk by workmanlike performance, and (d) even though the jury, as a matter of fact, found fault on the part of Texaco, it does not mitigate its claim against PSC.

the shipowner's warranty to excuse Atlantic's breach of the stevedore's warranty. That is the jury's task." (Italics added.)

A "material respect," in meaning and as used here, is analogous to "substantial cause" or "sufficiently material breach." We do not find that the "suggested agenda" was misleading or prejudicial.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.