[Civ. Nos. 45438, 45929. Second Dist., Div. Two. Oct. 8, 1975.]

DAYTON TIME LOCK SERVICE, INC., Plaintiff and Appellant, v.
SILENT WATCHMAN CORPORATION,
Defendant and Respondent.

**4**

**COUNSEL**

Benjamin J. Goodman and Sanford M. Ehrmann for Plaintiff and Appellant.

Iverson, Yoakum, Papiano & Hatch, Neil Papiano and Donald M. Robbins for Defendant and Respondent.

**OPINION**

**FLEMING, J.**—This is an action for declaratory relief, injunctive relief, and damages arising out of a series of disputes between plaintiff Dayton Time Lock Service, Inc., and defendant The Silent Watchman Corporation,[1] franchisee and franchisor, respectively, for a recording time lock system service. The trial court's findings favored defendant. Plaintiff appeals the judgment and the order requiring plaintiff to post an undertaking to stay the judgment pending appeal.

A recording time lock system replaces an ordinary door lock. The system, either mechanical or electro-mechanical, records on tape the time when the lock is opened and closed. Sophisticated models indicate which key is used to operate the lock. A recording time lock system service, such as the one operated by plaintiff, leases the system to its customers, installs and maintains the equipment, and provides a periodic written report of the data recorded by the lock.

Defendant manufactures the Dayton Time Lock and directly operates 11 time lock system services located in various parts of the country. Plaintiff is its only franchise holder. In 1960 plaintiff and defendant entered a 10-year exclusive franchise agreement, with renewal options,

---

[1] The Silent Watchman Corporation is successor in interest to or has used the name of The Recording Devices Company, Lock-Tronic Corporation, Controlock Corporation and Dayton Time Lock-Company.

effective retroactively to the start of their dealings in 1958, under which plaintiff was authorized to lease the Dayton Time Lock system to local customers in California, Oregon, and Washington, including branch offices of local customers in Arizona and Nevada. Plaintiff agreed not to compete with defendant during the franchise period and for 10 years thereafter. Defendant retained the right to lease to national customers in the territory. Defendant agreed to lease 1,794 Dayton Time Locks to plaintiff for a monthly charge. Plaintiff agreed to maintain the locks but could return them to defendant for major repairs or replacement. The agreement provided: "If [defendant] shall develop or obtain any improvements applicable to locks previously furnished to [plaintiff], it will, at the request of [plaintiff], furnish such improvements by furnishing suitable parts to [plaintiff] to be attached to such locks, provided that [defendant] and [plaintiff] can agree as to the amounts to be charged . . . for such parts . . . ."

In the early years of the agreement defendant manufacturer had difficulty keeping up a supply of 1,794 locks because the mechanical clocks in the locks were aging and replacements were no longer available. Defendant began a search for a new clock and for a new design for its lock system. In the mid-1960's defendant developed a prototype of a new electronic lock that subsequently became known as the Controlock, and it furnished models of this lock to plaintiff. In this same period plaintiff expanded its service to customers in states outside its franchise territory.

In 1968 plaintiff exercised its option to renew its franchise, and under the renewal the number of locks to be leased increased to 2,320. Thereafter plaintiff obtained from defendant 500 electric clock motors to replace failing mechanical clock motors in the Dayton Time Locks. Plaintiff, after discussions with defendant, also purchased 2,000 additional electric clock motors in Japan. About this time defendant began to lease the Controlock in plaintiff's franchise territory. By 1972 disputes on three basic issues brought the parties to court: (1) rights of the parties to service accounts within and without the franchise territory; (2) rights of the parties to lease the Controlock in the franchise territory; (3) responsibility for payment for the 2,000 electric clock motors.

After hearing the testimony of the principal parties and reviewing 15 years of correspondence between them, the trial court reached these conclusions: under the agreement and its extension plaintiff is entitled to lease and service the Dayton Time Lock but not the Controlock within

the stated franchise territory; defendant may compete for any customer that becomes a national account but may not lease the Controlock to local customers within the franchise territory; the anti-competition clauses do not violate the antitrust laws; defendant has no duty to pay for the 2,000 electric clock motors purchased by plaintiff.

Issues raised by plaintiff on appeal fall under six headings: (1) competitive limitations; (2) right to lease the Controlock; (3) compensation for electric clock motors; (4) damages for breach of contract; (5) undertaking on appeal; and (6) evidentiary rulings.

1. *Competitive Limitations.* Plaintiff contends the anti-competitive provisions of the agreement violate state and federal antitrust laws. Plaintiff also argues the evidence failed to justify the territorial and customer contractual limitations placed on plaintiff's business.[2] Defendant concedes the post-franchise anti-competitive provision of the agreement violates antitrust laws (Bus. & Prof. Code, § 16600) and plaintiff may retain extraterritorial customers now being serviced, but it contends the anti-competitive clause remains in effect during the life of the franchise[3] and the territorial limitations imposed on plaintiff's business are valid. On these points, we agree with defendant.

■ Exclusive-dealing contracts are not necessarily invalid. They may provide an incentive for the marketing of new products and a guarantee of quality-control distribution. They are proscribed when it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce. (*Standard Oil Co.* v. *United States,* 337 U.S. 293, 314 [93 L.Ed. 1371, 1386, 69 S.Ct. 1051].) A

[2]The trial court found:

"4. The Original Agreement expressly withheld the exclusive right to lease and service Dayton Time Locks to chain organizations from plaintiff.

"5. A chain organization as defined by the Original Agreement is any organization having a place of business in any of the states of California, Oregon or Washington and in one or more states in addition thereto.

"6. *Plaintiff may lease and service Dayton Time Locks in the states of Arizona and Nevada* to chain organizations on a non-exclusive basis which have places of business in California, Oregon or Washington and branch business locations in the states of Arizona and/or Nevada.

"7. Plaintiff has been granted no right to lease and service Dayton Time Locks in states other than California, Oregon, Washington, Nevada and Arizona."

[3]Paragraph 15 of the agreement provides: "[Plaintiff] agrees that, during the life of this contract, and any renewal or extension thereof, except as herein provided, it will not sell or lease any locks, devices or service of any kind in competition with the business of [defendant], or use any time recording lock not supplied by [defendant] under this agreement. It is specifically understood that the above limitation excludes the present business of [plaintiff] in alarm exit locks and/or sequel locks."

determination of illegality requires knowledge and analysis of the line of commerce, the market area, and the affected share of the relevant market. (*Tampa Electric Co.* v. *Nashville Co.,* 365 U.S. 320, 327-328 [5 L.Ed.2d 580, 586-587, 81 S.Ct. 623].) Plaintiff did not develop material evidence on these issues despite ample opportunity to do so at trial. Therefore it cannot be said that the challenged provision is invalid as a matter of law. Plaintiff is entitled only to a finding that the anti-competitive provision does not apply to 38 Dayton Time Locks already owned by plaintiff at the time of the original agreement and expressly excluded from its coverage.

■ The evidence amply supports the trial court's findings on territorial limitations. The findings follow the express language of the agreement, which authorizes plaintiff to service local accounts only within the stated franchise territory. Defendant allowed plaintiff to service some customers outside the franchise territory, but that fact did not negate defendant's right to enforce the written prohibition against extraterritorial service. Plaintiff did not establish its claim of contractual alteration or its claim of detrimental reliance on defendant's failure to assert its contractual rights. (See *Panno* v. *Russo,* 82 Cal.App.2d 408, 412 [186 P.2d 452]; *Bailey* v. *Breetwor,* 206 Cal.App.2d 287, 291 [23 Cal.Rptr. 740].)

■ 2. *The Controlock.* The trial court found that plaintiff had no right to lease the Controlock from defendant pursuant to the franchise agreement.[4] Yet the court also found that defendant "cannot compete with plaintiff by leasing the device known as the Controlock to non-chain organizations in the states of California, Oregon, and Washington."

[4]"2. The Original Agreement, and every provision contained therein, is clear and unambiguous.

"3. Under the terms of the Original Agreement defendant granted plaintiff the exclusive right to lease from defendant and thereafter to service a door lock, manufactured by defendant known as 'Dayton Time Lock' in the states of California, Oregon, and Washington.
. . . . . . . . . . . . . . . . . . .
"10. The Amendatory Agreement, and every provision contained therein, is clear and unambiguous.

"11. The Amendatory Agreement did not grant plaintiff the right to lease the device known as the 'Controlock' from defendant.

"12. The Controlock is not within the meaning of the term 'improvement' as said term is used in paragraph 7 of the Original Agreement.

"13. Plaintiff and defendant never contemplated nor intended that the Controlock would be included within or be the subject of any of the provisions of either the Original or Amendatory Agreements.

"14. Defendant never agreed, orally or in writing, to supply plaintiff with the device known as the Controlock on any basis other than an experimental or test basis.

"15. Plaintiff and defendant never agreed to a price to be charged if the Controlock

Plaintiff claims that under the franchise agreement it is entitled to the Controlock as a substitute for the Dayton Time Lock. We agree. The trial court's findings are irreconcilable. Either the Controlock is a competitive device with the Dayton Time Lock or is not; it can hardly be both. Since the evidence points unerringly to the fact that the Controlock is a competitive device, we conclude it is an improvement on the Dayton Time Lock within the sense of the franchise agreement. We agree that the original franchise agreement did not foresee the development of an entirely new device to replace the Dayton Time Lock, but nevertheless the agreement clearly visualized and made provision for improvements in the existing device. The fact that improvements later took on such a grand scale as to wholly replace the device they were intended to better did not make them any the less improvements within the meaning of the contract. Defendant has conceded the availability of the Controlock as a substitute for the Dayton Time Lock. Defendant, could not evade its responsibilities and frustrate the commercial purpose of the franchise agreement by merely changing the design and name of its principal product. In every contract the law implies a covenant of fair dealing by each party and a duty to do nothing to destroy the right of the other party to enjoy the fruits of the contract. (*McWilliams* v. *Holton,* 248 Cal.App.2d 447, 451 [56 Cal.Rptr. 574]; *Brogdex Co.* v. *Walcott,* 123 Cal.App.2d 575, 581 [267 P.2d 28].)

The agreement requires the parties to settle on a mutually acceptable price for an improvement. If the parties cannot agree between themselves, then on remand the trial court may make the determination for them. (*Cal. Lettuce Growers* v. *Union Sugar Co.,* 45 Cal.2d 474, 482 [289 P.2d 785, 49 A.L.R.2d 496].) A reasonable price for the improvement may be objectively determined from defendant's costs of development and the price it charges its own customers for use of the Controlock.

3. *The Electric Clock Motors.* The trial court found that defendant did not agree to pay, and had no legal obligation to pay, the $20,000 cost for the 2,000 electric clock motors purchased by plaintiff in Japan.[5] Plaintiff

were ever supplied to plaintiff by defendant on any basis other than an experimental or test basis.

"16. Any Controlocks supplied to plaintiff by defendant were for testing purposes only and were not supplied under the Original Agreement or the Amendatory Agreement.

"17. Neither defendant nor plaintiff by either act or conduct, interpreted or construed the provisions of the Original Agreement or the Amendatory Agreement to include the Controlock."

[5]The court concluded:

"12. Plaintiff and defendant did not agree, either orally or in writing, that defendants,

contends these findings are erroneous. In our view substantial evidence supports the trial court's finding on this issue.

The parties corresponded at length on the subject of payment for the motors, but this correspondence amounted to no more than negotiation. At one point defendant offered to pay for the motors over an extended period of time in return for future rights in a new encoder-decoder device for time recording locks which plaintiff was developing, but this offer was rejected by plaintiff. The parties never reached any agreement in writing on payment for the motors.

Plaintiff produced evidence to show that Paul Oppenheimer, a representative of defendant, orally agreed to reimburse plaintiff for the purchase of the 2,000 motors. But Oppenheimer explicitly denied he ever made such an agreement, or had even talked to plaintiff's representative on the occasion the agreement was supposedly made. Resolution of this evidentiary conflict was a matter for the trial court. (*Texaco, Inc.* v. *Petroleum Specialists Corp.*, 35 Cal.App.3d 427, 436 [110 Cal.Rptr. 641].)

The evidence also defeats plaintiff's claim that an implied contract to pay for the motors arose or that plaintiff acted in reasonable reliance on defendant's promise to pay for them. The trial court could reasonably conclude, as it did, that defendant made no promise to pay, express or implied.

█ In the alternative, plaintiff contends it is entitled to restitution for the cost of the 2,000 motors because defendant was unjustly enriched by plaintiff's fulfillment of defendant's contractual duty to provide workable clocks for the Dayton Time Lock. This contention is not supported by evidence, because plaintiff failed to prove that 2,000 additional motors were needed. Defendant had already supplied 500 electric clock motors for the 2,320 locks it was required to make available under the franchise agreement. Although plaintiff offered some evidence that defendant failed to maintain 2,320 working locks at all times, plaintiff never established the number of locks within this figure that were not working. Under the franchise defendant could be held responsible only for unworkable locks within the 2,320 figure. The trial court could not order restitution for an unproved benefit. (*French* v. *Robbins*, 172 Cal. 670, 679 [158 P. 188].)

or any of them, would repay in any manner for plaintiff's expenditure of any sum for the purchase of electric clock units manufactured in Japan.

   "13. Plaintiff is not entitled to recover any damages from defendant to repay plaintiff for the purchase by plaintiff of 2000 clocks manufactured in Japan."

4. *Damages.* Plaintiff contends the trial court should have awarded damages for defendant's breach of the franchise agreement.

First, plaintiff asserts that defendant converted one of plaintiff's customers, Discount Stores. Plaintiff had serviced Stores until August 1973, when defendant convinced Stores to use Controlock. Substantial evidence, however, indicated that CBS, Inc., a national company, purchased Stores in 1968, at which time Stores became a chain organization with which defendant could do business under the franchise agreement. (See findings 4 and 5, fn. 2, *ante.*) Moreover, plaintiff delayed until the end of trial the amendment to its complaint which sought damages for conversion of its customers, and we cannot say the trial court abused its discretion in refusing this untimely amendment. (*Roberts* v. *Karr,* 178 Cal.App.2d 535, 547 [3 Cal.Rptr. 98].)

Second, plaintiff claims damages for defendant's installation of a Controlock on a local nonchain account, Westpark Apartments in Westminster, California. But the evidence showed that principals in plaintiff's organization owned Westpark Apartments and solicited defendant's service as a test to see whether defendant would service a customer reserved for plaintiff under the franchise agreement. Plaintiff is not entitled to recover self-induced damages it could have avoided. (*Valencia* v. *Shell Oil Co.,* 23 Cal.2d 840, 844 [147 P.2d 558].)

Third, plaintiff seeks damages for defendant's failure to maintain the required number of workable locks under the franchise agreement. But, as pointed out, plaintiff did not present proof of such damages at trial.

5. *Undertaking on Appeal.* Plaintiff contends the trial court erred in requiring it to post a $10,000 undertaking to stay judgment pending appeal. Plaintiff argues it did not seek a stay. Code of Civil Procedure section 917.9 gives the trial court discretion to require an undertaking as a condition for stay. If plaintiff did not want a stay, it did not have to post the undertaking.

6. *Evidentiary Rulings.* Plaintiff's last contention is that the trial court erred in 20 evidentiary rulings, which precluded plaintiff from a fair presentation of its case. But in merely listing page and line citations for these rulings, plaintiff failed in its duty to support its claims of error with argument and citation of legal authority. (*Estate of Randall,* 194 Cal. 725, 728 [230 P. 445].) Nor has plaintiff suggested how the claimed errors, even if established, brought about a miscarriage of justice. (Cal. Const., art. VI, § 13.) We reject this contention summarily.

The order for undertaking on appeal is affirmed. The judgment is affirmed on the third, fourth, and fifth causes of action. The judgment is reversed on the first and second causes of action. Findings of fact numbered 2, 8, 10 to 17, and 23, conclusions of law numbered 1, 7, 8, 10, and 11, and paragraphs 6 and 8 of the judgment are vacated. The cause is remanded to the trial court for entry of new findings and further proceedings in accordance with this opinion. Each party will bear its own costs on appeal.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied October 29, 1975, and respondent's petition for a hearing by the Supreme Court was denied December 4, 1975. Mosk, J., was of the opinion that the petition should be granted.