[Civ. No. 67317. Second Dist., Div. Five. July 14, 1983.]

HARRY R. WEBB, JR., Plaintiff and Respondent, v.
WEST SIDE DISTRICT HOSPITAL, Defendant and Appellant.

**COUNSEL**

Borton, Petrini & Conron, Warren C. Wetteroth and John F. Stovall for Defendant and Appellant.

Rick Edwards for Plaintiff and Respondent.

**OPINION**

**ASHBY, J.**—West Side District Hospital (hospital) appeals from a judgment confirming an arbitration award of $122,000 in favor of respondent Dr. Harry Webb (Webb). (Code Civ. Proc., § 1287.4.) The hospital contends the judgment must be reversed on grounds that the contract on which the award was based was an illegal restraint of trade.

Initially, we set forth the standard of review applicable to this case. To promote the efficiency and finality of dispute settlements through arbitration, trial courts are generally precluded from examining the merits of the controversy, the sufficiency of the evidence, or the reasoning sup-

porting the arbitrator's decision. (*Santa Clara-San Benito etc. Elec. Contractors' Assn.* v. *Local Union No. 332* (1974) 40 Cal.App.3d 431, 437 [114 Cal.Rptr. 909].) Where, however, the losing party attacks the award as in excess of the arbitrator's powers (Code Civ. Proc., § 1286.2, subd. (d)) because the contract upon which the award was based was illegal, the issue of illegality is "for judicial determination upon the evidence presented to the trial court, and any preliminary determination of legality by the arbitrator, whether in the nature of a determination of a pure question of law or a mixed question of fact and law, should not be held to be binding upon the trial court." (*Loving & Evans* v. *Blick* (1949) 33 Cal.2d 603, 609 [204 P.2d 23].) ▮ Similarly, on appeal from the trial court's confirmation of the award, we are not bound by the arbitrator's determination of legality. The court's judgment, however, must be affirmed if it is supported by substantial evidence. (See *id.*, at p. 611.)

## FACTS

At the time relevant to this suit, the hospital, a government entity, was the only hospital within a radius of approximately 40 miles and provided the only emergency room facilities within that area. In August of 1979, the hospital entered into a contract with Webb requiring Webb to furnish competent physicians to staff the hospital's emergency room department on a 24-hour basis.[1] Either party could terminate the contract on 30-days' notice within the first year; otherwise, the contract would continue for 3 years with automatic renewal for like periods unless notice was given. The contract contained the following "non-interference" clause (§ 2.15) which the hospital now claims was in restraint of trade: "Hospital acknowledges that [Webb] will recruit, train, and contract with other physicians for the [emergency room] Department service and that this is a costly and time-consuming endeavor. Should Hospital wish, within two (2) years following the termination of this Agreement—measured from the last extension thereof— to directly or indirectly employ any physician who shall have contracted with [Webb] for Department service, Hospital shall first pay [Webb] the sum of $30,000.00 per physician, which accurately reflects the reasonable value of [Webb's] time and costs."

The two hospital administrators who negotiated the contract and its 1978 predecessor on behalf of the hospital, Mr. Chatwin and Mr. Bradshaw, testified that section 2.15 was fully understood and agreed to by themselves and the hospital's attorney and board. All parties recognized that Webb would incur large costs in recruiting, placing, orienting, and training phy-

---

[1]The 1979 contract was preceded by a similar one-year contract, executed in August of 1978.

sicians for the hospital, and that a competitor of Webb's or the hospital itself could easily undercut Webb's overall price by hiring the physicians Webb had already recruited without having to incur the same recruitment costs. The hospital nevertheless wanted the option of continuing to utilize the physicians Webb had supplied in case the contract was terminated. For this reason, the hospital's negotiators agreed to pay Webb the $30,000 per physician they—or a competitor of Webb's—might decide to keep on, a sum they felt was fair and reasonable, roughly equivalent to fees charged by physician placement services, and adequate to protect Webb against unfair exploitation of his labors. Bradshaw noted that before signing the contract with Webb, he had negotiated with two of Webb's competitors. Chatwin stated he had seen many contracts providing similar protection to contracting physicians, and understood such provisions to be fair and necessary.

In 1980, the hospital terminated the contract and hired a Dr. Saland to perform Webb's services. Saland in turn hired four of the physicians originally recruited by Webb. Mr. Occhiuto, who was the new hospital administrator, testified that Saland approached him and offered to perform Webb's services at substantially lower costs. Occhiuto denied suggesting to Saland who should be hired. In his opinion, general placement fees for physicians were well below $6,000 and the hospital could not afford the cost of $30,000 per physician.

Occhiuto's testimony was contradicted by Dr. Parks, one of the four physicians hired on by Saland. According to Parks, Occhiuto told Parks to contact Saland before the switch from Webb to Saland had been completed. Saland indicated to Parks he wanted to use as many as possible of the physicians already working in the emergency room department, and requested Parks to be his agent responsible for the department's administration, to which Parks agreed. Saland himself was virtually never present at the hospital.

Webb demanded $120,000 plus attorneys' fees from the hospital to compensate him for the four physicians the hospital had hired indirectly through contracting with Saland. When the hospital refused to pay, arbitration resulted. The hospital's sole defense then as now was that section 2.15 rendered the contract void as a restraint of trade according to Business and Professions Code section 16600.[2] The arbitrator, however, found the contract reasonable and without restraining effect. He found the $30,000 fee was intended to compensate Webb for the reasonable costs he had incurred

---

[2] "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Bus. & Prof. Code, § 16600.)

in placing the physicians. Payment of this fee was contingent upon early termination of the contract in order to compensate Webb for his inability to recoup these costs over a longer life of the contract.[3] He decided the provision did not restrain the hospital's business since the hospital could and did hire one of Webb's competitors and since physicians not recruited by Webb were available for direct or indirect employment, although some effort and expense would have been necessary to obtain their services. He found that Saland and possibly Occhiuto simply intended to undercut Webb's price by exploiting Webb's original efforts at recruitment and placement, the exact situation the contract was designed to prevent. The arbitrator awarded Webb $122,000, and upon Webb's petition, the trial court confirmed the award upon the evidence as presented to the arbitrator. This appeal has resulted.

## DISCUSSION

█ Whether an interference with the right to pursue a trade or occupation by means otherwise lawful lacks sufficient justification and hence is illegal "is determined not by applying precise standards but by balancing, in the light of all the circumstances, the respective importance to society and the parties of protecting the activities interfered with on the one hand and permitting the interference on the other." (*Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568]; *Centeno* v. *Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 69-70 [167 Cal.Rptr. 183]; *Blank* v. *Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 384-385 [44 Cal.Rptr. 572]. See generally, Annot. (1975) 62 A.L.R.3d 1014.) This balancing process has led to the recognition of certain restraints as reasonable and permissible in light of the interests to be protected. Although this case, because of its peculiar facts, has no directly applicable precedent in California, we find the restrictions imposed here were justified.

█ The hospital maintains section 2.15 impermissibly restricted the trade of both itself and of the individual physicians recruited by Webb. We first consider the restrictions placed on the hospital. The hospital relies principally on *Coombs* v. *Burk* (1919) 40 Cal.App. 8, 10 [180 P. 59], where a company supplying gas to Los Angeles residents entered into a contract with one customer wherein it agreed to install certain gas burning appliances

---

[3]We note that the contract as written would permit Webb to claim $30,000 per physician hired by the hospital no matter when the contract was terminated. However, since the evidence supports the arbitrator's conclusion that section 2.15 was intended to be enforced only in case of early termination, we will limit our discussion to the contract as so interpreted, and need not speculate upon the lawfulness of enforcement after the first full three-year term of the contract had run.

in the customer's home in exchange for his promise to purchase all of his gas from the company; if the customer purchased gas from anyone else, he would pay the company $330 in settlement of the installed articles. Pointing out that gas companies are engaged in a business "impressed with a public character," the *Coombs* court invalidated the contract: "Where a contract affects such character of business, since no restraint, however partial, can be tolerated, the court will not inquire into or consider the extent of the restriction imposed." (*Id.*, at p. 10.)

We find that *Coombs* is unpersuasive authority. Factually, *Coombs* must be distinguished. The gas company in *Coombs* demanded payment of $330 if Coombs would turn to *any* competitor, so that the clause indeed operated to give the company a monopoly status. (*Id.*, at p. 10.) In the case before us, the hospital was free to hire any of Webb's competitors or any physician not originally recruited by Webb; it had to pay the agreed upon fee only if it attempted to avoid the cost of recruitment and placement by hiring one of Webb's physicians. Second, assuming that the instant case is analogous to or has the effect of an exclusive dealing contract, *Coombs'* per se rejection of such contracts has not been accepted. (*Great Western etc. v. J. A. Wathen D. Co.* (1937) 10 Cal.2d 442, 448 [74 P.2d 745]; *Associated Oil Co. v. Myers* (1933) 217 Cal. 297, 305 [18 P.2d 668].) Instead, contracts requiring parties to deal with each other exclusively or exacting penalties for a failure to do so are now measured against the same balancing test referred to above. (*Dayton Time Lock Service, Inc. v. Silent Watchman Corp.* (1975) 52 Cal.App.3d 1, 6-7 [124 Cal.Rptr. 678]; *Great Western etc. v. J. A. Wathen D. Co., supra,* 10 Cal.2d at pp. 448-449.) Lastly, *Coombs'* per se condemnation of any restrictions on businesses affected with a public interest also has not been followed in subsequent cases. Instead, the public's interest is merely one factor to be balanced against other relevant concerns. (*Willis v. Santa Ana etc. Hospital Assn., supra,* 58 Cal.2d at p. 810; *Centeno v. Roseville Community Hospital, supra,* 107 Cal.App.3d at pp. 68-70; see also *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 558 [116 Cal.Rptr. 245, 526 P.2d 253]; see generally, Sloss & Becker, *The Organization Affected with a Public Interest and Its Members—Justice Tobriner's Contribution to Evolving Common Law Doctrine* (1977) 29 Hastings L.J. 99.) Recent case law indicates that hospitals, whether public or private, in many respects are businesses affected with a public interest (e.g., *Wilson v. California Health Facilities Com.* (1980) 110 Cal.App.3d 317, 325 [167 Cal.Rptr. 801]); yet, cases considering restraint of trade challenges against them have not adopted a per se rule, but instead have carefully weighed the competing interests and upheld the practices if they were found reasonable. (E.g., *Centeno v. Roseville Community Hospital, supra,* 107 Cal.App.3d at pp. 68-72; *Willis v. Santa Ana etc. Hospital*

*Assn., supra,* 58 Cal.2d at p. 810.) In short, we find *Coombs* not controlling.

Thus, we now consider the reasonableness of the provision restricting the hospital. ■ The reasonableness of contracts which tend to restrain trade is measured by a number of factors, including the appropriateness of the restraint to advancing the interests to be protected; the availability of less harmful alternatives; the nature of the interest interfered with; the intent of the parties or the tendency of the restraint to create a monopoly; and the social or economic justification for any monopoly, if it does result. (*Blank* v. *Palo Alto-Stanford Hospital Center, supra,* 234 Cal.App.2d at p. 385.) The general practice among hospitals is nearly always relevant in deciding the issue. (*Id.*; see also 6A Corbin, Contracts (1962) § 1394, pp. 89-93.) Judged by these factors, the arbitrator's decision upholding section 2.15 was clearly supported by the evidence.

■ All parties involved in negotiating the contract agreed that its purpose was not to create a monopoly, but instead to allow the hospital to employ physicians originally recruited by Webb while at the same time protecting Webb against the unfair exploitation of his services. Indeed, competitors to Webb existed when the contract was negotiated and after it terminated. Chatwin stated he had seen many similar provisions in other hospital-physician contracts and understood them to be fair and necessary. He also acknowledged that the hospital would have had to pay a placement fee substantially similar to the amount set in section 2.15 if it had recruited physicians through employment agencies. When Saland and possibly Occhiuto induced Parks and his three companions to sign on with Saland, the exploitation of Webb's services, against which section 2.15 was designed to guard, in fact occurred. On the other hand, the only evidence tending to show some degree of restraint was Occhiuto's statement that the hospital could not afford the cost per physician imposed by the contract. Occhiuto did not, however, testify that no other physicians or contracting services such as Webb's were available, or that the hospital might become understaffed or unable to provide its services. On this record, we must find the fees charged to be reasonable and without illegal restraining effect.

The hospital urges this case is controlled by *Muggill* v. *Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239 [42 Cal.Rptr. 107, 398 P.2d 147], where the court struck down a contract providing that an employee's right to receive vested retirement benefits would terminate if he ever entered the employ of any competitor. *Muggill* and cases like it, however, are inapposite factually because here it is not the employee (Webb)[4] but the employer (the

---

[4]Actually, the agreement between Webb and the hospital describes Webb as an independent contractor.

hospital) who was restricted. Assuming an analogy should nevertheless be made, the instant situation is more analogous to cases such as *Gordon* v. *Landau* (1958) 49 Cal.2d 690, 694 [321 P.2d 456], where a restriction prohibiting an employee from exploiting his employer's confidential customer lists following his termination was upheld as reasonably necessary to protect the employer's interest.[5] Here, Webb's economic interest was equally valuable and protectible: without recoupment of the recruitment expenses he had incurred, Webb became vulnerable to unfair exploitation of his labors by the hospital. (See also *Leonard* v. *Fallas* (1959) 51 Cal.2d 649 [335 P.2d 665] [provision valid which required payment of broker's commission if, within 90 days of termination of exclusive agency agreement, property was sold to a person whose name the broker had furnished to the owner].)[6]

We now consider the hospital's second contention that section 2.15 was illegal because it restrained the recruited physicians' ability to work at the hospital or compete equally with other physicians applying there. This argument is not persuasive. Most analogous to the restriction at issue here are exclusive dealing contracts between hospitals and groups of physicians, which, if reasonable, have been upheld even if they completely excluded other physicians from the hospitals. (See generally, Annot. (1976) 74 A.L.R.3d 1268.) Thus, in *Centeno* v. *Roseville Community Hospital, supra,* 107 Cal.App.3d 62, the hospital had entered into an exclusive radiology medical services contract with a partnership of physicians; when one of the partners left the partnership, the hospital's refusal, in light of its prior contract, to permit him to use its radiology facilities for himself was upheld as valid. (See also *Blank* v. *Palo Alto-Stanford Hospital Center, supra,* 234 Cal.App.2d 377.) In the instant case, the physicians were not precluded from working at the hospital's emergency room facilities, but their employ-

[5]The only case we have discovered with substantially similar facts is from outside this state. In *Hospital Consultants, Inc.* v. *Potyka* (Tex.Civ.App. 1975) 531 S.W.2d 657, a Dr. Bobbitt contracted with a hospital to provide it with emergency room physicians, but required the hospital to pay $50,000 for any physician it hired who had worked in *any* of the several hospitals to which Bobbitt furnished similar services. The *Potyka* court held that Bobbitt had a legitimate interest in preventing his physicians from "stealing" his customer, the hospital, and could have protected this interest by restraining the hiring of physicians who had actually worked at the hospital in question. It upheld the lower court's decision invalidating the clause as unreasonable, however, because the clause went beyond the necessary protection to include physicians who had never actually worked at the hospital. Thus, *Potyka* supports our holding. We also note that Bobbitt's main concern, the "pirating" of a customer because of the employee's close association with the customer, is, in fact, what occurred here: Parks, although an agent of Saland's, actually began running the department in Webb's place.

[6]We do not imply that Webb acquired a protectible interest in the physicians' increase in skills and knowledge, which is a concomitant to every employment situation and is an interest appertaining exclusively to the employee. (See *Hospital Consultants, Inc.* v. *Potyka, supra,* 531 S.W.2d at p. 662; 6A Corbin, Contracts (1962) § 1394, pp. 99-100.) The interest we find protectible here is limited to the placement services furnished.

ment was merely conditioned upon payment by the hospital of a reasonable fee for services it had already received. As the court said in *Dayton Time Lock Service, Inc.* v. *Silent Watchman Corp., supra,* 52 Cal.App.3d at pages 6 and 7: "A determination of illegality [of exclusive dealing contracts] requires knowledge and analysis of the line of commerce, the market area, and the affected share of the relevant market. [Citation.] Plaintiff did not develop material evidence on these issues despite ample opportunity to do so at trial. Therefore it cannot be said that the challenged provision is invalid as a matter of law." Similarly, the record here contains no evidence of the overall effect of section 2.15 on individual doctors. The evidence does, however, support the reasonableness of the section: had these physicians originally attempted to contact the hospital through a placement agency, the hospital would have had to pay a similar fee in that case also. In conclusion, we cannot find this contract illegal, but will leave the parties to the bargain they struck.

The judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.