**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COMEDY CLUB, INC., a Louisiana
corporation; AL COPELAND
INVESTMENTS, INC., a Louisiana
corporation,
            *Plaintiffs-Appellants,*

            v.

IMPROV WEST ASSOCIATES, a
California Limited Partnership;
CALIFORNIA COMEDY, INC., a
California corporation,
            *Defendants-Appellees.*

No. 05-55739

D.C. No.
CV-03-08134-WMB

COMEDY CLUB, INC., a Louisiana
corporation; AL COPELAND
INVESTMENTS, INC., a Louisiana
corporation,
            *Plaintiffs-Appellants,*

            v.

IMPROV WEST ASSOCIATES, a
California Limited Partnership;
CALIFORNIA COMEDY, INC., a
California corporation,
            *Defendants-Appellees.*

No. 05-56100

D.C. No.
CV-03-08134-WMB

OPINION

On Remand From The United States Supreme Court

Filed January 29, 2009

989

Before: Jerome Farris and Ronald M. Gould, Circuit Judges, and Kevin Thomas Duffy,* District Judge.

Opinion by Judge Gould

---

*The Honorable Kevin Thomas Duffy, Senior United States District Judge for the Southern District of New York, sitting by designation.

**COUNSEL**

Karina B. Sterman, Kelly O. Scott, Ervin, Cohen & Jessup, LLP, Beverly Hills, California, for appellants Comedy Club, Inc. and Al Copeland Investments, Inc.

Robert N. Klieger, Irell & Manella LLP, Los Angeles, California, for appellees Improv West Associates and California Comedy, Inc.

## OPINION

GOULD, Circuit Judge:

On June 13, 1999, Comedy Club, Inc. and Al Copeland Investments, Inc. (collectively "CCI") executed a Trademark License Agreement ("Trademark Agreement") with Improv West Associates ("Improv West") that granted CCI an exclusive nationwide license to use Improv West's trademarks. A few years later, CCI breached the agreement and sought to protect its interests in the trademarks in federal district court by filing a declaratory judgment action. After a complex procedural history, the parties were left with an arbitration award and two district court orders, one order compelling the parties to arbitrate, and another order confirming the arbitration award. CCI appealed both district court orders. We have jurisdiction under 28 U.S.C. § 1291.

In a prior opinion, published at 514 F.3d 883, we determined that we lacked jurisdiction to review the district court's order compelling arbitration. We affirmed in part and vacated in part the district court's order confirming the arbitration award. The Supreme Court vacated that opinion and remanded this case to us for reconsideration in light of *Hall Street Associates L.L.C. v. Matel, Inc.*, 128 S. Ct. 1396 (2008). We determine that *Hall Street Associates* does not undermine our prior precedent, *Kyocera Corp. v. Prudential-Bache T. Servs.*, 341 F.3d 987 (9th Cir. 2003) (en banc). As a result, in this circuit, an arbitrator's manifest disregard of the law remains a valid ground for vacatur of an arbitration award under § 10(a)(4) of the Federal Arbitration Act. Therefore, we adhere to the outcome in our prior decision.

# I

Improv West is the founder of the Improv Comedy Club and the creator and owner of the "Improv" and "Improvisation" trademarks ("Improv marks"). CCI owns and operates restaurants and comedy clubs nationwide. On June 13, 1999, CCI and Improv West entered a Trademark Agreement[1] that provided, *inter alia*: (1) that Improv West granted CCI an exclusive nationwide license to use the Improv marks in connection with the opening of new comedy clubs; (2) that, according to a development schedule, CCI was to open four Improv clubs a year in 2001 through 2003;[2] and (3) that CCI was prohibited from opening any non-Improv comedy clubs during the term of the Trademark Agreement.[3] The Trademark Agreement also had an arbitration clause:

> All disputes relating to or arising under this Agreement or the Asset Purchase Agreement shall be resolved by arbitration in Los Angeles, California in accordance with the commercial arbitration rules of the American Arbitration Association. In any such arbitration, the parties shall be entitled to discovery in the same manner as if the dispute was being litigated in Los Angeles Superior Court. Notwithstanding this agreement to arbitrate, the parties, in

---

[1]Also on June 13, 1999, in a separate Asset Purchase Agreement, CCI purchased the Melrose Improv Club from Improv West. The Melrose Improv Club is located in Los Angeles, California.

[2]The original § 12.a. of the Trademark Agreement called for CCI to open and operate at least three Improv clubs by 2001, and two each year thereafter so that CCI would own and operate at least seven Improv clubs by 2003. CCI and Improv West amended § 12.a. on October 19, 1999, creating the schedule of four Improv clubs a year in 2001 through 2003.

[3]Section 9.j. of the Trademark Agreement stated: "Licensee shall not own or operate, and Licensee shall ensure that none of its Affiliates shall own or operate any bar, restaurant, nightclub, or other facility which presents live stand-up or sketch comedy performances or live improvisational performances, other than the Melrose Improv or a Club, or Second City."

addition to arbitration, shall be entitled to pursue equitable remedies and agree that the state and federal courts shall have exclusive jurisdiction for such purpose and for the purpose of compelling arbitration and/or enforcing any arbitration award. The parties agree to submit to the jurisdiction of such courts and agree that service of process in any such action may be made by certified mail. The prevailing party in any arbitration or action to enforce this Agreement or the Asset Purchase Agreement shall be entitled to its costs, including reasonable attorneys fees.

CCI concedes that it failed to open eight Improv clubs by 2002,[4] and that it was in default of amended § 12.a. of the Trademark Agreement. Consistent with Improv West's sole remedy, as stated in § 13.b.,[5] Improv West sent CCI a letter asserting that CCI was in default of the Trademark Agreement, withdrawing CCI's license to use the Improv marks and rights to open more Improv clubs, and informing CCI that Improv West intended to begin opening its own Improv clubs.

In response to Improv West's letter, CCI filed a complaint in federal district court seeking declaratory relief. CCI's com-

---

[4]In CCI's original complaint, CCI claims that it opened or obtained an interest in at least seven Improv clubs, not including the Melrose Improv Club.

[5]Section 13.b. of the Trademark Agreement provided Improv West's sole remedy in the event CCI defaulted on the § 12.a. development schedule. In pertinent part, § 13.b. stated:

Nothwithstanding the above enumerated remedies, in the event [CCI] fails to fulfill the schedule set forth in section 12.a., [Improv West's] sole remedy shall be as follows. Upon notice to [CCI], [CCI] shall lose the right, power, and License (i) to use the Trademarks in connection with any Clubs which are not, as of the date of such failure, under construction or open for business and operated by [CCI], an Affiliate of [CCI] or other Operator and (ii) to sub-license Third Parties use of the Trademarks in connection with any new Clubs.

plaint sought a declaration that the covenant that CCI could not open any non-Improv comedy clubs was void under California Business and Professions Code ("CBPC") § 16600, and that CCI's failure to meet the development schedule did not revoke CCI's license to the Improv marks or right to open Improv clubs. Improv West then filed a demand for arbitration seeking damages.[6]

On August 2, 2004, the district court ordered the parties to arbitrate their dispute. CCI did not appeal that order until May 16, 2005.

On February 28, 2005, the arbitrator entered a Partial Final Arbitration Award that stated: (1) that CCI defaulted on the Trademark Agreement by failing to adhere to the development schedule listed in amended § 12.a.; (2) that CCI forfeited its rights to open Improv clubs and its use of the Improv marks license in connection with any clubs not open or under construction as of October 15, 2002; (3) that Improv West could open or license to third parties new Improv clubs; (4) that § 9.j. of the Trademark Agreement was "a valid and enforceable in-term covenant not to compete" and remained valid "for the remaining term of the Agreement"[7]; (5) that CCI and its "Affiliates"[8] were enjoined from opening or oper-

---

[6]In a further response, CCI amended its complaint seeking to enjoin Improv West from opening, or authorizing third parties to open, any Improv clubs, and asking for disgorgement of Improv West's profits from any such action.

[7]Unless the parties agree to terminate the Trademark Agreement earlier, by its own terms, the Trademark Agreement does not end until 2019.

[8]Section 1 of the Trademark Agreement stated, in relevant part, that " 'a Person' " is "any natural person, or any corporation, partnership, joint venture, limited liability company, business association, trust . . . or other entity," and that the term "Affiliate" means and includes "any members of such Person's immediate family, or the member of the immediate family of any direct or indirect shareholder of such Person . . . . Further, the members of the immediate family of any Person shall include all collateral relatives of such Person having a common linear ancestor with such Person, and the spouse or any former spouse of such Person or any of such collateral relatives of such spouse." '

ating any other comedy clubs other than those open or under construction as of October 15, 2002 for the duration of the Trademark Agreement; (6) that neither CCI nor its Affiliates could change the name on any of its current clubs; and (7) that Improv West was entitled to attorneys fees and costs. On April 14, 2005, the district court confirmed the Partial Award. CCI timely appealed, tendering to us the issues addressed in this opinion.[9]

In an opinion filed on September 7, 2007 and amended on January 23, 2008, we held that we did not have jurisdiction to review the district court's order compelling the parties to arbitrate; that the arbitrator did not exceed his authority by arbitrating the equitable claims; that the arbitrator did exceed his authority by issuing permanent injunctions that enjoined relatives who were not parties to the agreement; that the arbitrator's award was not completely irrational; and that the arbitrator's enforcement of the covenant not to compete was a manifest disregard for the law. The Supreme Court granted a petition for a writ of certiorari, vacated our prior opinion, and remanded this case to us to reconsider our decision in light of *Hall Street Associates v. Matel.*

Both parties agree that this remand only affects the portion of the prior opinion in which we found the arbitrator acted with a "manifest disregard of the law." Therefore, we continue to hold that we do not have jurisdiction over the district court's order compelling arbitration. We also determine that the arbitrator did not exceed his authority when he arbitrated the equitable claims, but that he exceeded his authority

---

[9]Although all the issues in this appeal concern the arbitrator's decision in the Partial Final Arbitration Award entered on February 28, 2005, the arbitrator issued a second arbitral award, the Final Arbitration Award, which was decided on May 20, 2005. The district court confirmed that award on June 21, 2005, and entered judgment on August 29, 2005. CCI timely appealed the district court's order confirming the Final Arbitration Award on July 20, 2005, but raised no issues on appeal concerning that award. We consolidated the two cases for appeal purposes.

regarding the permanent injunction that enjoined non-parties to the agreement. We also decide that the arbitrator's award was not completely irrational. Finally, addressing the issue raised by the Supreme Court's remand, we conclude that *Hall Street Associates* did not undermine the manifest disregard of law ground for vacatur, as understood in this circuit to be a violation of § 10(a)(4) of the Federal Arbitration Act, and that the arbitrator manifestly disregarded the law.

## II

CCI first argues that the district court erred when it issued its order compelling the parties to arbitrate. Improv West in turn contends that we lack jurisdiction over this issue because CCI's appeal of the district court's order compelling arbitration is untimely.

[1] The district court's order compelling the parties to arbitrate dismissed CCI's claims when it sent the parties to arbitration. Because the district court's order dismissed CCI's claims, it is a final order. *See Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 86 (2000) (holding that a district court's order dismissing the plaintiffs claims and compelling arbitration was a final decision because the order "end[ed] the litigation on the merits and le[ft] nothing more for the court to do but execute the judgment" (internal quotation marks omitted)); *see also* 9 U.S.C. § 16(a)(3) (2006) ("An appeal may be taken from . . . a final decision with respect to an arbitration that is subject to this title."); 9 U.S.C. § 16(a)(3) prac. cmt. (instructing that subdivision (a)(3) makes appealable a district court's determination compelling arbitration that is a final decision); *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1153 n.1 (9th Cir. 2004) (adopting the principle that "a dismissal renders an order appealable under § 16(a)(3)" (citation omitted)).

[2] 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1) require that a notice of appeal be filed in a civil

case "within 30 days after the judgment or order appealed from is entered." Fed. R. App. P. 4(a)(1)(A). Because the district court did not enter judgment on the order to compel arbitration, CCI had 180 days to appeal the order. *See* Fed. R. App. P. 4(a)(7)(A)(ii); *see also Bowles v. Russell*, ___ U.S. ___, 127 S.Ct. 2360, 2363 (2007) (stating that "the taking of an appeal within the prescribed time is mandatory and jurisdictional" (internal quotation marks omitted)).

**[3]** CCI filed its first notice of appeal of the district court's order compelling arbitration on May 16, 2005, 287 days after the order was entered on August 2, 2004. This is well beyond the 180 days allowed by Federal Rule of Appellate Procedure 4(a)(7)(A)(ii). CCI's appeal of the district court's order compelling arbitration is untimely, and we lack jurisdiction to hear the appeal of that issue.

## III

We next consider CCI's contention that the district court erred by confirming the arbitration award. We review a district court's confirmation of an arbitration award de novo. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 947-48 (1995). CCI presents four arguments: (1) that the arbitrator lacked authority to arbitrate the equitable claims; (2) that the arbitrator exceeded the scope of his authority by issuing two permanent injunctions; (3) that the arbitrator's award is irrational; and (4) that the arbitrator's award violates CBPC § 16600. We address each argument in turn.

## A

CCI submits that the arbitrator lacked authority to arbitrate because the arbitration clause in the Trademark Agreement grants state and federal courts an "exclusive" jurisdiction over equitable claims. We review the validity and scope of an arbitration clause de novo. *See Moore v. Local 569 of Int'l Bhd. of Elec. Workers*, 53 F.3d 1054, 1055-56 (9th Cir. 1995).

**[4]** It is well established "that where the contract contains an arbitration clause, there is a presumption of arbitrability." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.*; *see also Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1139 (9th Cir. 1991) ("Under the Federal Arbitration Act . . . any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." (internal quotation marks and citation omitted)).

It is also well established that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. Only disputes "that the parties have agreed to submit to arbitration" should be arbitrated. *Id.* at 943; *see also Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991) (stating that "[t]he scope of the [arbitration] clause must . . . be interpreted liberally").

**[5]** Under California contract law, "if the language [of a contract] is clear and explicit, and does not involve an absurdity" the language must govern the contract's interpretation. Cal. Civ. Code § 1638. Moreover, when a contract is written, "the intention of the parties is to be ascertained from the writing alone, if possible." Cal. Civ. Code § 1639. "[I]f reasonably practicable" a contract must be interpreted as a whole, "so as to give effect to every part, . . . each clause helping to interpret the other." Cal. Civ. Code. § 1641; *see also In re Affordable Hous. Dev. Corp.*, 175 B.R. 324, 329 (B.A.P. 9th Cir. 1994) ("California law provides that one phrase of a contract should not be interpreted so as to render another phrase of the contract meaningless."). However, "[i]f a contract is capable of two different reasonable interpretations, the con-

tract is ambiguous," *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441, 1448 (1997), and under the federal presumption in favor of arbitration, an arbitrator would have jurisdiction to arbitrate claims. *See AT&T Techs.*, 475 U.S. at 650; *Three Valleys*, 925 F.2d at 1139.

Applying these principles, we conclude that the Trademark Agreement's arbitration clause grants the arbitrator authority over "all disputes" arising from the Trademark Agreement. There are three relevant clauses in the arbitration agreement: (1) "[a]ll disputes relating to or arising under this Agreement . . . shall be resolved by arbitration"; (2) "[n]otwithstanding this agreement to arbitrate, the parties, in addition to arbitration, shall be entitled to pursue equitable remedies and agree that the state and federal courts shall have exclusive jurisdiction for such purpose and for the purpose of compelling arbitration and/or enforcing any arbitration award"; and (3) "[t]he prevailing party in any arbitration or action to enforce this Agreement . . . shall be entitled to its costs, including reasonable attorneys fees."

CCI contends that clause two is explicit that only state and federal courts, and not an arbitrator, have jurisdiction over equitable claims. Improv West counters that the second clause only carved out equitable claims "in aid of arbitration" to maintain the status quo between the parties pending arbitration, and that the second clause did not "supplant the arbitrator's authority" to decide all disputes under the Trademark Agreement.

**[6]** A natural reading of clause two lends plausibility to Improv West's theory. The language "in addition to arbitration" in clause two suggests that arbitration still applies to all disputes, but that in addition, the parties are "entitled to pursue equitable remedies" before courts. If the parties intended to carve out an exception to arbitration for all equitable claims, they could have done so without the language "in addition to arbitration." Because the parties included this lan-

guage, it is plausible and a permissible contract interpretation that the equitable claims exception in clause two was intended to apply only to claims designed to maintain the status quo between the parties. Stated another way, it was a rational interpretation of the agreement to say that the arbitrator could decide both equitable and legal claims and that the provision for court jurisdiction on equitable matters was ancillary to the arbitration. Moreover, the Federal Arbitration Act, 9 U.S.C. § 3, provides a court with the ability to stay "trial of [an] action until such arbitration has been had," but it does not give a court the authority to issue equitable remedies, such as a temporary injunction, to maintain the status quo between the parties. Thus, it makes sense that if the parties wanted to give themselves the ability to seek temporary equitable remedies in courts while arbitration was ongoing, they would add such a clause to the arbitration agreement.

To support its interpretation, CCI cites language in clause three that awards costs and attorneys fees to "the prevailing party in any arbitration or action to enforce this Agreement," and phrasing in clause two that grants exclusive jurisdiction to courts for the "purpose" of "equitable remedies." These phrases, although consistent with CCI's reading of the arbitration agreement, are equally consistent with Improv West's interpretation. These phrases can support that the arbitration agreement lets the parties pursue equitable remedies in courts in aid of the arbitration, and gives those courts exclusive jurisdiction over, and awards costs and attorneys fees to the prevailing party in, those actions.

**[7]** We conclude that the arbitration agreement is "capable of two different reasonable interpretations." *Oceanside 84*, 56 Cal. App. 4th at 1448. Under the federal presumption in favor of arbitration, because the arbitration agreement is ambiguous, it should be interpreted as granting arbitration coverage over "all disputes" arising from the Trademark Agreement. *See AT&T Techs.*, 475 U.S. at 650; *Three Valleys*, 925 F.2d at 1139. We hold that the arbitration agreement gave the arbi-

trator authority over all disputes, equitable and legal, and that he did not exceed his authority by arbitrating equitable claims.

## B

We next address CCI's argument that the arbitrator exceeded the scope of his authority in issuing two permanent injunctions, which would provide grounds to vacate the arbitration award. *See Coutee v. Barington Capital Group, L.P.*, 336 F.3d 1128, 1134 (9th Cir. 2003); 9 U.S.C. § 10(a)(4).

In his partial arbitration award, the arbitrator (1) enjoined CCI and its Affiliates from opening or operating any other comedy clubs other than those open or under construction as of October 15, 2002 for the duration of the Trademark Agreement and (2) enjoined CCI and its Affiliates from changing the name on any of their current clubs until the Trademark Agreement ended. CCI argues that because the Trademark Agreement defines Affiliates to include "family members, family members of shareholders, all collateral relatives,[10] former spouses, and all collateral relatives of former spouses," the permanent injunctions attempt to bind persons beyond the scope of the arbitrator's authority.[11] We agree.

---

[10]Black's Law Dictionary defines "collateral relative" as "[a] relative who is not in the direct line of descent, such as a cousin." Black's Law Dictionary 1315 (8th ed. 2004).

[11]CCI raises this issue for the first time on appeal. Although we generally do "not consider an issue raised for the first time on appeal," we recognize three exceptions to that rule, by which we may invoke our discretion and review the issue: (1) where "review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process"; (2) where there is a change in the law creating a new issue; or (3) "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004) (internal quotation marks and citation omitted). Here, we exercise our discretion and review CCI's argument under exceptions one and three.

**[8]** A contract may bind non-parties such as an intended third party beneficiary, an agent, or an assignee. *See Benasra v. Marciano*, 92 Cal. App. 4th 987, 991 (2001). But generally arbitration clauses and contracts do not bind non-parties in the absence of such extraordinary relationships. As explained in *Buckner v. Tamarin*, 98 Cal. App. 4th 140 (2002): "The strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement . . . ." *Id.* at 142 (internal quotation marks omitted); *see also NOR-CAL Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 76 (2000) ("The common thread . . . is the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement. In the absence of such a relationship, courts have refused to hold nonsignatories to arbitration agreements.").

**[9]** Here, the arbitrator's injunctions, relying on the Trademark Agreement's definition of Affiliate, seek to prevent people such as cousins of former spouses of CCI partners from opening or operating any comedy club within the United States until 2019. These collateral relatives are not in privity with the Trademark Agreement signatories, or with CCI shareholders, partners, or "persons." As an example, it is not reasonable to preclude from gainful competition in the comedy club sphere relatives of ex-spouses of the CCI principals who were not in an agency relationship with those principals. Similarly, the arbitrator did not have authority to enjoin a non-party grandmother of a CCI partner from opening a restaurant with live stand up comedy performance until the year 2019. Under California law, the arbitrator lacked the authority to enjoin these non-parties from owning or operating comedy-related businesses or restaurants.

Improv West contends that Federal Rule of Civil Procedure 65(d) ("Rule 65(d)") establishes that an injunction may bind not only parties to the action but also "their officers, agents, servants, employees, and attorneys, and [upon] those persons in active concert or participation with them." Fed. R. Civ. P.

65(d). However, the wholesale inclusion of relatives as Affiliates in the Trademark Agreement's covenant not to compete, and the injunctions in the arbitrator's partial award, go well beyond binding CCI's agents, employees, or people in active concert or participation with it as Rule 65(d) permits. Indeed, as mentioned above, § 9.j., by its own terms, reaches beyond persons with an agency or assignee relationship with CCI partners, and literally purports to bind a CCI "person's" ex-wife and his ex-wife's cousins, nephews, uncles, and aunts. The text of Rule 65(d) is exclusive, stating that an injunction can permissibly bind "only" those persons listed in Rule 65(d). Rule 65(d) does not list collateral relatives of former spouses, or even grandparents, as potential non-parties who may be bound by a contract or an arbitration award. And we do not think it is a proper use of equitable power to restrain all such persons.

Moreover, precluding non-party relatives or ex-spouses from opening or operating improv-comedy-related businesses or restaurants violates CBPC § 16600. CBPC § 16600 provides, in relevant part, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." *Id.* This is a codification of "the general rule in California [that] covenants not to compete are void." *Hill Med. Corp. v. Wycoff*, 86 Cal. App.4th 895, 901 (2001). By restricting non-party relatives and ex-spouses from engaging in a lawful business, the injunctions, with respect to those persons, exceed the arbitrator's authority.

**[10]** We conclude that the arbitrator acted beyond the scope of his authority as a matter of California law in attempting to bind all of CCI's Affiliates, including relatives who were not parties to the Trademark Agreement, and thus could not be bound by its provisions. If an arbitrator exceeded the scope of his authority in issuing an award, and that award is divisible, we may vacate part of the award and leave the remainder in force. *See Lyle v. Rodgers*, 18 U.S. (5 Wheat.) 394, 409

(1820) (Marshall, C.J.) (stating that "an award may be void in part, and good for the residue"); *Barington Capital*, 336 F.3d at 1134 ("A federal court may vacate an arbitration award, or a portion thereof, if the arbitrators acted beyond their authority."). We therefore conclude that the district court should vacate the arbitration award insofar as it enjoins any of CCI's Affiliates who are not connected to the principals of CCI as, by analogy to Rule 65(d), "their officers, agents, servants, employees, and attorneys, and [upon] those persons in active concert or participation with them." We hold that a narrowing of the restrictive covenant on Affiliates is required by CBPC § 16600 and the principle that non-parties generally are not bound in arbitration. Such non-parties can only be restrained to the extent permitted by Rule 65(d).

## C

CCI next contends that the partial arbitration award is irrational because it simultaneously revokes CCI's license to open Improv clubs and prevents CCI from opening or operating any other comedy clubs anywhere in the United States until 2019 or the termination of the Trademark Agreement.

**[11]** Review of an arbitration award is " 'both limited and highly deferential' " and the arbitration award "may be vacated only if it is 'completely irrational' or 'constitutes manifest disregard of the law.' " *Poweragent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004) (quoting *Barington Capital*, 336 F.3d at 1132-33). We have not elaborated on what "completely irrational" means, but the Eighth Circuit has persuasively indicated that the "completely irrational" standard is extremely narrow and is satisfied only "where [the arbitration decision" fails to draw its essence from the agreement." *Hoffman v. Cargill Inc.*, 236 F.3d 458, 461-62 (8th Cir. 2001). This is a view that we adopt.

Under the partial arbitration award, CCI lost its exclusive right to open and operate any new Improv clubs using Improv

West's license. And because the arbitrator found the § 9.j. covenant not to compete of the Trademark Agreement valid, CCI also lost the right to open and operate any other new comedy clubs or restaurants under any other license or name anywhere in the contiguous United States as long as the Trademark Agreement remained in effect. Thus, apart from allowing CCI to continue to operate the handful of Improv clubs that it had already opened or purchased, *see supra* note 4, the arbitrator's ruling put CCI out of the comedy club business.

CCI argues that if it has lost all licensing rights, then there is no longer any licensing agreement. Both parties agree that if the Trademark Agreement is no longer in effect then the § 9.j. covenant not to compete similarly would no longer be in effect, and the arbitrator's award would be considered irrational.

However, as Improv West correctly asserts, Improv West did not cancel the Trademark Agreement, neither party sought to terminate the Trademark Agreement as part of the underlying actions, and nothing in the parties' submissions, the arbitrator's rulings, or the district court's orders suggest that the Trademark Agreement was cancelled. Instead, CCI was still bound under other sections of the Trademark Agreement to pay Improv West royalties on the seven Improv clubs it still operated at the conclusion of the arbitration.

A breach by a party to a contract does not in itself cancel the contract.[12] Cancellation of a contract occurs when "either party puts an end to the contract for breach by the other."[13]

---

[12]The general rule is that if the breach is a material breach, it may give grounds for the non-breaching party to cancel the contract, *see Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993), but if the breach is a partial breach, the non-breaching party's remedy is for damages. *See Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1708-09 (1996).

[13]" 'Termination occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach.' " *See* Witkin, *Summary of California Law* § 925 (internal quotation marks omitted).

*See* Bernard E. Witkin, *Summary of California Law* § 925 (10th ed. 2005) (internal quotation marks omitted); *see also* Restatement (Second) of Contracts § 274 (1979); 13 Arthur Linton Corbin, *Corbin on Contracts* § 67.2 (Rev. ed 2003).

At the time of arbitration, Improv West had not cancelled, nor had the parties terminated, the contract. In the arbitration Improv West did not seek to terminate the contract. By the arbitrator's own award, the arbitrator did not modify the party's contractual relationship, including the required payment of royalties, on the seven Improv clubs that CCI had opened or bought and was running. Further, per the arbitrator's award, the covenant not to compete ends when the Trademark Agreement ends. CCI will then be able to open up other non-Improv clubs.

CCI entered into the Trademark Agreement with knowledge that there would be consequences if it defaulted on the development schedule in § 12.a. of the Trademark Agreement. An arbitrator could rationally decide that the § 9.j. covenant not to compete was valid to some degree, while at the same time upholding Improv West's remedy to end CCI's exclusive license rights to open other Improv clubs.

**[12]** The basic outline of what the arbitrator did, terminating an exclusive right to open Improv clubs nationwide, because of contractually inadequate performance contrary to the agreed schedule, while keeping in force the restrictive covenant makes sense in so far as CCI should not have an exclusive license on Improv clubs absent complying with designated performance. And so long as CCI was running some Improv clubs, a restrictive covenant to some degree could protect Improv West from damage caused by improper competition. Because we cannot say that there is no basis in the record for the arbitrator's decision, we hold that the arbitrator's award is not completely irrational. *See NF&M*, 524 F.2d at 760.

**D**

**[13]** Finally, we address CCI's claim that the partial arbitration award should be vacated because it is in violation of CBPC § 16600. CCI argues that the arbitrator's validation of § 9.j. is in manifest disregard of the law. Improv West counters that after the recent Supreme Court case, *Hall Street Associates*, 128 S. Ct. 1396 (2008), manifest disregard of the law is not a valid ground for vacatur. In *Hall Street Associates*, the Supreme Court held that the FAA provided exclusive grounds to modify or vacate an arbitration award. *Id.* at 1404. Improv West argues that manifest disregard of the law is not among the statutory grounds for vacatur, and therefore we must amend our prior opinion that vacated this part of the arbitrator's award for that reason.

**[14]** We have already determined that the manifest disregard ground for vacatur is shorthand for a statutory ground under the FAA, specifically 9 U.S.C. § 10(a)(4), which states that the court may vacate "where the arbitrators exceeded their powers." *Kyocera Corp. v. Prudential-Bache T Servs.*, 341 F.3d 987, 997 (9th Cir. 2003) (en banc) (holding that "arbitrators 'exceed their powers' . . . when the award is 'completely irrational,' or exhibits a 'manifest disregard of law' ") (citations omitted). The Supreme Court did not reach the question of whether the manifest disregard of the law doctrine fits within §§ 10 or 11 of the FAA. *Hall Street Associates*, 128 S. Ct. at 1404. Instead, it listed several possible readings of the doctrine, including our own. *Id.* ("Or, as some courts have thought, 'manifest disregard' may have been shorthand for §10(a)(3) or § 10(a)(4), the subsections authorizing vacatur when the arbitrators were 'guilty of misconduct' or 'exceeded their powers.' ") (*citing Kyocera*, 341 F.3d at 997). We cannot say that *Hall Street Associates* is "clearly irreconcilable" with *Kyocera* and thus we are bound by our prior precedent. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Therefore, we conclude that, after *Hall Street Associates*, manifest disregard of the law remains a valid

ground for vacatur because it is a part of § 10(a)(4). We note that we join the Second Circuit in this interpretation of *Hall Street Associates*. *Stolt-Nielsen Transportation*, 548 F.3d 85, *27 (2d Cir. 2008). *But see Ramos-Santiago v. UPS*, 524 F.3d 120, 124 n.3 (1st Cir. 2004).

We have stated that for an arbitrator's award to be in manifest disregard of the law, "[i]t must be clear from the record that the arbitrator[ ] recognized the applicable law and then ignored it." *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995).

**[15]** Under CBPC § 16600, it is well established that broad covenants not to compete are void unless they involve a situation where "a person sells the goodwill of a business [or] where a partner agrees not to compete in anticipation of dissolution of a partnership," *see Kelton v. Stravinski*, 138 Cal. App. 4th 941, 946 (2006), CBPC §§ 16601, 16602, or "they are necessary to protect . . . trade secrets." *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1462 (2002). Neither party alleges any of the above exceptions apply in this case.

The majority of cases interpreting CBPC § 16600 under California law deal with post-contract or post-employment covenants not to compete. *See e.g.*, *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th at 1443; *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1427-29 (2003). In this case, the Trademark Agreement has not been terminated or canceled; rather the contractual relationship between CCI and Improv West is ongoing and § 9.j. can be viewed as an in-term covenant not to compete.[14]

---

[14]Because Improv West revoked CCI's rights to the Improv marks for almost the entire contiguous United States, the Improv West-CCI licensing relationship has ended except as to the existing Improv clubs. Bearing this in mind, it might be possible to view § 9.j., with respect to the majority of the United States, functionally as if it were a post-term covenant not to compete, and with respect to the Improv clubs that CCI continues to oper-

**[16]** We have not found, and the parties do not cite, any Ninth Circuit or California cases holding that in-term covenants not to compete of any scope are necessarily valid. There are, however, cases addressing in-term covenants not to compete, and we discuss several of those cases here because of the limitations that we believe they impose under § 16600, even in the context of a continuing covenant not to compete.

Most significant to our analysis is *Dayton Time Lock Service, Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d 1 (1975), in which the California Court of Appeal, addressed an in-term "exclusive dealing clause" in a franchise agreement. *Id.* at 6. The exclusive dealing clause provided in part that "during the life of this contract, . . . [Dayton Time Lock Service, Inc. ("DTLS")] will not sell or lease any locks, devices or service of any kind in competition with the business of [Silent Watchman Corp. ("SW")], or use any time recording lock not supplied by [SW] under this agreement." *Id.* DTLS argued that this anti-competitive provision, along with a separate post-franchise covenant not to compete, violated state and federal antitrust laws. *Id.* The California Court of Appeal first noted that SW conceded that the post-term covenant not to compete violated the state antitrust law CBPC § 16600. *Id.* Next, the court specifically addressed whether the in-term covenant not to compete was valid. In this context, the court held that "[e]xclusive-dealing contracts are not necessarily invalid," but "[t]hey are proscribed when it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce." *Id.* In doing so, *Dayton Time Lock* imposed the standards analogous unto federal anti-

---

ate, as an in-term covenant not to compete. However, because the contract relationship has not been canceled, and continues for the existing Improv clubs operated by CCI, we think it more appropriate conceptually to analyze § 9.j. nationwide as an in-term covenant not to compete, while considering CCI's limited continuing use of the Improv marks as pertinent to the scope of § 9.j.

trust law when interpreting § 16600. *See id.* (citing *Standard Oil Co. v. United States*, 337 U.S. 293, 314 (1949)).[15]

In *Kelton v. Stravinski*, the California Court of Appeal addressed another in-term covenant not to compete, this time in a partnership context. 138 Cal. App. 4th at 945.[16] The court held that even though the Kelton-Stravinski covenant not to compete was during an ongoing business relationship, it violated CBPC § 16600 and was unenforceable. *Kelton*, 138 Cal. App. 4th at 947. The court in *Kelton* limited *Dayton Time Lock* to franchise agreements. However, in stressing CBPC § 16600's strong policy against anti-competition agreements,

---

[15]Similar to *Dayton Time Lock*, the District Court for the Northern District of Illinois in *Great Frame Up Systems, Inc. v. Jazayeri Enterprises*, 789 F.Supp. 253 (N. D. Ill. 1992), stated, while interpreting California law on CBPC § 16600, that California courts support the position "that preventing defendants from competing only during the term of [an] existing franchise agreement, would not be void." *Id.* at 255. The court reasoned, however, that the in-term contractual provisions still cannot prevent a party from engaging in an entire profession, business or trade. *See id.* at 256.

Finally, in *General Commercial Packaging, Inc. v. TPS Package Engineering, Inc.*, 126 F.3d 1131 (9th Cir. 1997) (per curiam), we addressed a covenant not to compete in a general contractor-subcontractor context. General Commercial Packaging ("GCP"), a packing and crating service, subcontracted with TPS for TPS to provide packing and crating services for Walt Disney Company, one of GCP's major customers. *Id.* at 1132. TPS and GCP signed an in-term and post-term covenant not to compete, which provided that TPS would not work directly for, or solicit business from, Disney or any other company GCP introduced to TPS. *Id.* Although from the opinion it is unclear whether TPS and GCP's business relationship dissolved, we nonetheless upheld the covenant not to compete because it only limited the sub-contractor's "access to a narrow segment of the packing and shipping market." *Id.* at 1134. Because the covenant not to compete left a substantial portion of the packing and shipping market open to TPS, we held that the covenant not to compete was enforceable. *Id.*

[16]The covenant not to compete provided that Kelton agreed not to operate any warehouses and Stravinski agreed not to design or build any warehouses. *Kelton*, 138 Cal. App. 4th at 945.

the court reaffirmed that in the franchise context, § 16600 prohibits an in-term covenant not to compete that "will foreclose competition in a substantial share of the affected line of commerce." *Kelton*, 138 Cal. App. 4th at 947-48.

**[17]** *Dayton Time Lock* and *Kelton* make evident that under CBPC § 16600 an in-term covenant not to compete in a franchise-like agreement will be void if it "foreclose[s] competition in a substantial share" of a business, trade, or market. *Dayton Time Lock*, 52 Cal. App. 3d at 6; *Kelton*, 138 Cal. App. 4th at 948. Also, California courts are less willing to approve in-term covenants not to compete outside a franchise context because there is not a need "to protect and maintain [the franchisor's] trademark, trade name and goodwill." *Kelton*, 138 Cal. App. 4th at 948. Keeping in mind these settled principles of California law that were set forth in *Dayton Time Lock* and reaffirmed by *Kelton*, which principles were expressly before the arbitrator, we proceed to evaluate whether the arbitrator's decision was in manifest disregard of the law.

CCI's "business" is operating full-service comedy clubs. CCI currently operates at least seven Improv clubs. *See supra* note 4. As interpreted by the arbitrator, the § 9.j. covenant not to compete applies geographically to the contiguous United States, and does not end until 2019. Thus, the covenant not to compete has dramatic geographic and temporal scope. Combined with the arbitrator's ruling that CCI forfeited its rights to use the Improv marks license in any new location, the practical effect of the arbitrator's award enforcing § 9.j. is that for more than fourteen years the entire contiguous United States comedy club market, except for CCI's current Improv clubs, is off limits to CCI. This "foreclose[s] competition in a substantial share" of the comedy club business. *Dayton Time Lock*, 52 Cal. App. 3d at 6; *see also Gen. Commercial*, 126 F.3d at 1134 (reasoning that a contract cannot place "a substantial segment of the market off limits").

In ruling on CCI's motion for reconsideration the arbitrator reasoned as follows:

> *Dayton Time Lock* . . . is inapplicable. That case involved an attack on an exclusive dealing contract under the *antitrust laws*. The cases cited in the portion of the *Dayton* opinion . . . involved validity of exclusive dealing contracts under the federal Sherman Act. The type of "rule of reason" analysis applied in antitrust cases — involving the determination whether a particular agreement unreasonably restricts competition generally in a defined geographic and product market — is not applicable to a determination of illegality under Section 16600. California's antitrust statute, the Cartwright Act, is separate and distinct from § 16600 of the Business & Professions Code.

**[18]** The arbitrator's award, while aware of *Dayton Time Lock*, interpreted it in a way to render it inapplicable to this case. However, as we have explained, *Dayton Time Lock* established that under CBPC § 16600 in-term covenants not to compete cannot prevent a party from engaging in its business or trade in a substantial section of the market. The arbitrator's award effectively quarantines CCI from engaging in its business in forty-eight states until 2019 and does not follow well-established California law. *See Dayton Time Lock*, 52 Cal. App. 3d at 6; *Great Frame Up Sys.*, 789 F. Supp at 256; *see also Gen. Commercial*, 126 F.3d at 1134. Even under the permissive standard with which we view arbitral decisions, the economic restraint of § 9.j. on competition is too broad to be countenanced in light of the clear prohibition of § 16600, as interpreted by the California courts. The grounds given by the arbitrator for disregarding *Dayton Time Lock* are fundamentally incorrect.[17] We hold that the arbitrator's ruling

---

[17]First, the arbitrator reasoned that *Dayton Time Lock* was inapplicable because it involved an assessment of antitrust laws. However, *Dayton*

that § 9.j. is a valid covenant not to compete ignores CBPC § 16600 and thus is in manifest disregard of the law. To comply with § 16600, the covenant not to compete must be more narrowly tailored to relate to the areas in which CCI is operating Improv clubs under the license agreement.

However, we do not void the entire in-term covenant not to compete. *Kelton* stressed that the franchisor-franchisee context was different from an employment or partnership context. CCI's relationship with Improv West is in essence a franchise agreement as CCI contracted with Improv West to use Improv West's trademarks and open comedy clubs modeled on Improv West's clubs. *See Kelton*, 138 Cal. App. 4th at 947-48 (discussing franchising under California law). Assessing the requirements of California law, we weigh CCI's right to operate its business against Improv West's interest "to protect and maintain its trademark, trade name and goodwill." *Id.* at 948. This balance tilts in favor of Improv West with regard to counties where CCI is operating an Improv club, but under the restraint of CBPC § 16600 California law does not permit an arbitrator to foreclose CCI's competition in opening comedy clubs throughout the United States.

[19] Therefore, we hold that the district court should vacate the arbitrator's injunctive relief as to any county where CCI does not currently operate an Improv club, but uphold § 9.j. in those counties where CCI currently operates Improv clubs.

---

*Time Lock* made clear that it was assessing the requirements of CBPC § 16600, and its plain language applied standards from antitrust cases in aid of its application of § 16600. Second, the arbitrator thought § 16600 was inapplicable because California in the Cartwright Act had a separate antitrust statute distinct from § 16600, but the arbitrator's notice of the Cartwright Act does not detract from what *Dayton Time Lock* held in assessing an issue under § 16600, which *Dayton Time Lock* itself characterized as a state antitrust law. Both § 16600 and the Cartwright Act deal with antitrust and competition policy and it was not in the province of the arbitrator to make a "ruling" about § 16600 that was so at odds with what the California Court of Appeal stated in *Dayton Time Lock*.

*See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 123 (2000) (stating that "overbroad covenants not to compete may be restricted temporally and geographically" (citing *Gen. Paint Corp. v. Seymour*, 124 Cal. App. 611, 614-15 (1932))). Nationwide CCI may open and operate non-Improv comedy clubs in all those counties where it does not currently operate an Improv club. However, CCI may not open or operate any non-Improv clubs in those counties where it currently owns or operates Improv clubs.

## IV

**[20]** In sum, we hold that CCI's appeal of the district court's order compelling arbitration is untimely and we lack jurisdiction to consider that issue. We conclude (1) that the arbitrator properly arbitrated the equitable claims; (2) that the arbitrator's award is not completely irrational; (3) that the arbitrator exceeded the scope of his authority by enjoining the non-party Affiliates; and (4) that the arbitrator's award violates CBPC § 16600. We vacate the district court's order confirming the arbitration award and remand to the district court with instructions to vacate the Partial Final Arbitration Award in so far as it enjoins CCI's Affiliates, unless they are agents or otherwise acting for CCI, and to the extent it prevents CCI from opening or operating non-Improv clubs in counties in which CCI does not now operate or own an Improv club.[18]

---

[18]Improv West contends, without opposition from CCI, that the arbitration section in the Trademark Agreement entitles it to attorneys' fees and costs associated with this appeal and the confirmation proceedings of the arbitration awards. The arbitration agreement does award "costs, including reasonable attorneys fees" to "[t]he prevailing party." And we have upheld such an award for a party who successfully confirmed an arbitration award. *See A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1404 (9th Cir. 1992) (per curiam) (ordering the arbitration award confirmed, and awarding the prevailing party "attorneys' fees in accordance with the agreements between the parties"). However, in this case Improv West partially confirmed the arbitrator's award, but we have modified the scope of that award. We hold that Improv West is entitled to costs and fees only with regard to its work on the issues on which it prevailed. We remand the issue of costs and attorneys' fees to the district court to determine the amount of reasonable attorneys' fees and costs that should awarded to Improv West insofar as it prevailed.

**AFFIRMED IN PART, VACATED IN PART, and REMANDED** to the district court for further proceedings consistent with this opinion.