**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4253
_____

JOSEPH BELLANTUONO,

Appellant

v.

ICAP SECURITIES USA, LLC
_____

Appeal from the United States District Court
for the District of New Jersey
(Civ. Action No. 2-11-cv-05289)
District Judge: Honorable Esther Salas
_____


Submitted Pursuant to LAR 34.1(a)
on November 6, 2013

Before: GREENAWAY JR. , VANASKIE, and ROTH,  *Circuit Judges*

(Filed:  January 30, 2014)
_____

OPINION
_____

VANASKIE, *Circuit Judge.*

At issue in this appeal from an order confirming an arbitration award is whether

the arbitration panel manifestly disregarded the law or material evidence by denying

discovery of certain documents, and whether the arbitration panel manifestly disregarded

the law by refusing to grant a mistrial or strike pleadings as a sanction for the untimely production of a document. Having carefully reviewed the record, we conclude that Appellant Joseph Bellantuono has failed to carry his substantial burden of showing a manifest disregard of the law or a failure to consider material evidence in the arbitration panel's rulings. Accordingly, we will affirm the District Court's judgment.

I.

We write primarily for the parties, who are familiar with the facts and procedural history of this case. Accordingly, we set forth only those matters necessary to our analysis.

Joseph Bellantuono worked for ICAP Securities USA, LLC ("ICAP") and its predecessors for approximately twenty-two years before he was fired in September 2008. At the time of his termination, Bellantuono worked as a senior broker on ICAP's Mortgage Backed Securities ("MBS") Desk. In his capacity as a broker, Bellantuono "was responsible for generating profits for clients by using client funds to buy and sell financial instruments." (Appellant's Br. at 4).

In February 2003, Bellantuono and ICAP entered into a written employment agreement, setting forth the conditions of Bellantuono's position as a broker, and providing for a two year term beginning on January 1, 2003 and ending on December 31, 2004. The parties twice extended the 2003 employment agreement by written addenda, with the final extension concluding on December 31, 2008. Bellantuono and ICAP dispute whether John Geraci, the MBS Desk Manager, orally extended Bellantuono's

employment agreement with ICAP beyond that date.  The agreement specified that ICAP "[m]ay terminate immediately this Agreement and [Bellantuono's] employment under this agreement, for cause."  (App. 205).

In addition to performing client services as a broker, Bellantuono also used ICAP funds to purchase financial instruments with the aim of generating personal and corporate profits — a practice known as "proprietary trading."  In order to facilitate such trading, ICAP created a "house" account, or the "210 Account."  Bellantuono and Geraci were the only employees permitted to engage in proprietary trading using funds from the 210 Account.  They each received 25% of the profits generated by the account, with the other 50% going to ICAP.  It is undisputed that until January 2007, Bellantuono engaged in proprietary trading with ICAP's permission.

ICAP formally banned proprietary trading in January 2007.  Bellantuono nevertheless testified at the arbitration hearing that, with the blessing of ICAP executives, he continued trading in the 210 Account "throughout 2007 and during the first quarter of 2008 . . . with the intent to make a profit . . . ."  (App. 1371).  According to Bellantuono, he never even heard the term "proprietary trading," let alone learned of ICAP's prohibition of the practice until "somewhere around" May 2008.  (App. 1372).  Conversely, ICAP asserts that Bellantuono knew of the company's ban on proprietary trading by, at least, April 1, 2008.  Geraci testified that on that date, he delivered to Bellantuono a copy of ICAP's March 28, 2008 Broking Policy, which states that "neither ICAP nor any of its brokers shall engage in proprietary trading."  (App. 112).

ICAP also alleges that Bellantuono impermissibly engaged in a practice known as "flashing" or "flash trading" whereby he disseminated false trading information into the marketplace by posting fictitious trades on public trading screens. In 2006, in response to an SEC investigation into flash trading by ICAP's United States Treasury Desk, the company instituted policies prohibiting the practice of flash trading. ICAP asserts that despite being made aware of these policies, Bellantuono "had engaged in the prohibited activity of flash trading . . . [in 2007 and 2008]." (App. 253).

In 2008, the SEC issued subpoenas seeking documentation and information relating to the MBS Desk. As a result, ICAP hired the law firm of Cleary Gottlieb Steen & Hamilton ("Cleary Gottlieb") to conduct an internal investigation into the MBS Desk. In July 2008, ICAP's CEO, Douglas Rotten, suspended Bellantuono pending the results of Cleary Gottlieb's investigation. At the arbitration hearing, Rotten testified that during his suspension, Bellantuono was provided with counsel and "given the opportunity to vindicate himself", (App. 2205), but was unable to provide any explanation justifying his violations of ICAP policies.

Bellantuono's employment with ICAP was terminated on September 8, 2008. Following his termination, ICAP filed with the SEC a Uniform Termination for Securities Industry Regulation, or "Form U-5," indicating that, among other reasons, Bellantuono was fired for "violation of company's policies and procedures relating to

certain broking and related practices."[1] (App. 358). On September 12, 2008, ICAP's general counsel sent Bellantuono a termination letter, which offered essentially the same explanation for his dismissal.[2]

On February 2, 2009, Bellantuono commenced a FINRA arbitration proceeding against ICAP, claiming wrongfully withheld compensation, breach of contract by not extending his employment through 2010, wrongful employment termination, and defamation. According to Bellantuono, the justifications proffered by ICAP in its September 12, 2008 termination letter were pretexts for his suspension and subsequent firing. The real reason he was fired, according to Bellantuono, was that ICAP offered him as a sacrificial lamb "in order to placate the SEC and deter an invasive and expansive investigation." (App. 20).

The three-member FINRA panel (the "Panel") overseeing the arbitration proceedings issued a scheduling order on November 24, 2009. The parties thereafter engaged in discovery over the course of approximately seven months. Pursuant to the

---

[1]   In Bellantuono's Form U-5, dated September 12, 2008, and signed by ICAP's Corporate Compliance Officer, Bruce E. Fenske, a circle indicating "yes" is filled in beside the question "[c]urrently is, or at termination was, the Individual under internal review for fraud or wrongful taking of property, or violation of *Investment-related* statutes, regulations, rules or industry standards of conduct." (App. 359).

[2]   As the District Court explained, ICAP's September 12, 2008 termination letter stated that Bellantuono's "violative conduct" included, without limitation, "(1) flash trading; (2) proprietary trading; (3) violating [ICAP's] March 2008 Broking rules; (4) using the 210 Account to deprive other brokers of commissions and to circumvent client commission caps; (5) unauthorized cancellation or amendment of trades in the 210 Account; and (6) charging improper commissions." (App. 5).

Panel's scheduling order, discovery closed on June 30, 2010 and the deadline to file discovery motions was August 31, 2010. Nevertheless, and even though the arbitration hearing was scheduled to begin on December 7, 2010, Bellantuono filed a motion on December 3, 2010 to compel production of all documents relating to the MBS Desk that ICAP produced to the SEC. Three days later, on December 6, 2010, just one day before the arbitration hearing was set to begin, Bellantuono filed a "motion to compel production of all documents prepared in connection with the internal investigation conducted by . . . Cleary Gottlieb . . . on behalf of [ICAP]." (App. 387). ICAP submitted a letter brief in opposition, arguing that Bellantuono's motions were both untimely and meritless.

In addition to considering both parties' written submissions, the Panel conducted oral argument on Bellantuono's motions. After each side reiterated their positions and responded to questions posed by the arbitrators, the Panel denied Bellantuono's motions without an opinion.

Bellantuono achieved a somewhat different result when he renewed his motions during the arbitration hearing. The Panel still refused to require production of the Cleary Gottlieb investigation file, but it ordered ICAP to "produce or to search and produce" documents that Cleary Gottlieb sent to the SEC in response to subpoenas. (App. 1383). ICAP acted in accordance with the Panel's order by producing 456 conforming documents, excluding a number of communications that the company deemed irrelevant, confidential or privileged. Bellantuono, however, argued that ICAP had failed to comply

6

with the Panel's discovery order by withholding the excluded documents. The Panel heard oral argument on the issue, considered case law presented by the parties, and denied Bellantuono's motion, holding that ICAP's production complied with the Panel's previous order.

On June 22, 2011, after 18 days of hearings over the course of 6 months, during which 12 witnesses testified and over 70 documents were introduced into evidence, the Panel awarded Bellantuono $643,500 plus interest. The Panel did not explain the basis for its award, but both parties agree that the figure compensates Bellantuono for his unpaid 2008 second quarter bonus.

On September 15, 2011, Bellantuono commenced an action in the United States District Court for the District of New Jersey to vacate the arbitration award under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10. He argued that such relief was necessary because the Panel "manifestly disregarded the law and failed to consider material evidence . . . ." (App. 30). ICAP opposed Bellantuono's petition and moved for confirmation of the award as permitted by the FAA, 9 U.S.C. § 9.

On October 12, 2012, the District Court denied Bellantuono's petition to vacate, granted ICAP's cross-petition, and affirmed the Panel's award. The District Court held that Bellantuono failed to meet "his burden to demonstrate that the panel's decisions amounted to a manifest disregard of the law", (App. 10), or that the Panel was guilty of misconduct.

Bellantuono appeals, challenging the District Court's confirmation of the arbitration award. He asks this Court to reverse for substantially the same reasons that he challenged the award before the District Court.

## II.

The District Court exercised jurisdiction over Bellantuono's petition to vacate or modify the arbitration award and ICAP's cross-petition to confirm the award pursuant to 28 U.S.C. § 1332(a) and 9 U.S.C. § 9. We have appellate jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. §16(a). When reviewing a district court decision upholding an arbitration award, we review the district court's "legal conclusions de novo and its factual findings for clear error." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012), *aff'd*, 133 S.Ct. 2064 (2013).

Our review of the arbitration award itself, however, "could be generously described only as extremely deferential." *Dluhos v. Strasberg*, 321 F.3d 365, 372 (3d Cir. 2003). "[M]indful of the strong federal policy in favor of commercial arbitration, we begin with the presumption that the award is enforceable." *Sutter*, 675 F.3d at 219. The narrow circumstances under which a court may vacate an arbitration award are defined exclusively in Section 10 of the FAA. *See Hall Street Assocs. LLC v. Mattell, Inc.*, 552 U.S. 576, 586-87 (2008). A court may vacate an arbitration award pursuant to Section 10 where: (1) the award was procured by corruption, fraud, or undue means; (2) the arbitrators demonstrated partiality or corruption; (3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded their powers. 9 U.S.C. § 10(a)(1)-(4).

8

Bellantuono challenges the arbitration award on a ground not specifically listed in Section 10 of the FAA: "manifest disregard of the law." It is to that particular assertion that we first direct our attention.

### A. Manifest Disregard of the Law

Bellantuono contends the Panel's handling of certain discovery-related issues reflected such a manifest disregard of controlling law that its award must be vacated. Prior to the Supreme Court's decision in *Hall Street*, this Court and many others held that a court may vacate an arbitration award if the "arbitrator's decision evidences a manifest disregard for the law" even though "manifest disregard for the law" is not one of the statutorily prescribed grounds for vacatur enumerated in Section 10 of the FAA. *See, e.g., Tanoma Min. Co. v. Local Union No. 1269 United Mine Workers,* 896 F.2d 745, 749 (3d Cir. 1990) (internal quotation marks and citation omitted). The Supreme Court in *Hall Street* held that "the grounds for vacatur . . . provided by § . . . 10 . . . of the FAA are exclusive." 552 U.S. at 581. Since then, our sister Circuit Courts of Appeals are split on the question of whether manifest disregard of the law remains a viable ground for vacating an arbitration award.[3]

---

3    The Second, Fourth and Ninth Circuits have held that manifest disregard of the law survived *Hall Street* because an arbitrator exceeds his powers under 9 U.S.C. § 10(a)(4) by manifestly disregarding the law. *See Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 93-95 (2d Cir. 2008), *overruled on other grounds,* 559 U.S. 662 (2010); *Wachovia Sec. LLC v. Brand*, 671 F.3d 472, 480 (4th Cir. 2012); *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1281 (9th Cir. 2009). Conversely, the Fifth, Eighth and Eleventh Circuits have held that manifest disregard of the law is no longer a

This Court has not yet ruled on the issue. Because we find that the District Court was correct in concluding that the Panel did not act in manifest disregard of the law, we need not do so here.

The manifest disregard theory allows a court to vacate an arbitration award "where the arbitrator's decision evidence[s] a manifest disregard for the law rather than an erroneous interpretation of the law." *Dluhos*, 321 F.3d at 369 (internal quotation marks omitted). A party seeking to vacate an arbitration award based on the theory that the arbitrators manifestly disregarded the law "bears the burden of proving that the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it." *Duferco v. Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003). The question here is whether the Panel's discovery rulings or the Panel's refusal to grant a mistrial for the untimely production of a document reflect a refusal to apply a plainly controlling rule of law.

### 1. ICAP Documents sent to the SEC

During the arbitration proceedings, Bellantuono sought to compel the production of any and all documents that Cleary Gottlieb produced to the SEC on behalf of ICAP. He argued that "at least 260,000 pages of documents were submitted to the SEC" that

---

valid ground for vacatur in light of *Hall Street. See Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 350 (5th Cir. 2009); *Medicine Shoppe Int'l, Inc. v. Turner Invs., Inc.*, 614 F.3d 485, 489 (8th Cir. 2010); *Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1314 (11th Cir. 2010).

were never produced by ICAP in "violation of the Panel's order . . . ." (App. 492). On appeal, Bellantuono asserts that the Panel's "failure to compel disclosure of the communications between the SEC and ICAP clearly constituted manifest disregard of the law." (Appellant's Br. at 27). We disagree.

ICAP had objected to production of documents delivered to the SEC on various grounds, including relevance and privilege. The Panel denied the request for production of documents without offering an explanation. Under these circumstances, Bellantuono "faces a tremendous obstacle. If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995). Bellantuono has not carried his substantial burden of showing that the bases for ICAP's objections to production were implausible. Nor has he pointed to any controlling law that the Panel manifestly disregarded. In this regard, discovery rulings are largely discretionary, and we cannot say that there is "absolutely no support at all in the record justifying the [Panel's] determinations" that would warrant denial of enforcement of the award. *News America Publ'ns, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990). Accordingly, the District Court properly concluded that the Panel did not manifestly disregard the law in refusing to compel the production of communications between ICAP and the SEC.

2. *The Cleary Gottlieb Investigation File*

The record also shows that prior to denying Bellantuono's motion to compel production of the Cleary Gottlieb investigation file, the Panel meaningfully considered both sides' arguments regarding whether the file was protected as work product or privileged as attorney-client communications. In fact, the Panel heard oral argument on the issue on two separate occasions. And each time, ICAP presented plausible legal arguments that support the Panel's decision to refuse to compel production. We are therefore not persuaded that the Panel's holdings regarding the Cleary Gottlieb investigation file constitute a manifest disregard of the law.

Bellantuono also argued at the arbitration hearing that even if the Cleary Gottlieb investigation file could be considered protected by the attorney client and work product privileges, ICAP waived those privileges by placing the "advice of counsel" at issue. ICAP countered by asserting that Bellantuono was mischaracterizing the company's position as an "advice of counsel" defense. ICAP acknowledged that the facts uncovered during Cleary Gottlieb's investigation were discoverable, but argued that the law firm's legal advice and mental impressions related to those facts were privileged. In support of its arguments, ICAP presented the Panel with relevant law, which it applied to the facts in a way that supports the conclusion that ICAP did not waive its right to assert the attorney-client or work product privileges.

ICAP's arguments, both those made orally during the arbitration hearing as well as in letter briefs, were persuasive and well-supported by the applicable law. "[T]here must be absolutely no support at all in the record justifying the arbitrator's determinations for a

court to deny enforcement of an award." *Id.* Accordingly, the Panel's order denying Bellantuono's motion to compel production of the Cleary Gottlieb investigation file is not a sufficient basis for vacating the Panel's award.

### 3. *The Mistrial Ruling*

On March 2, 2011, after the arbitration hearings had commenced, ICAP, through counsel, sent a letter to Bellantuono disclosing that it had "recently discovered" an e-mail which it "previously had been unable to locate." (App. 676). ICAP subsequently sought to admit the e-mail into evidence on March 23, 2011. In so doing, ICAP's counsel described the contents of the e-mail, revealing that it was sent to Bellantuono and contained a copy of ICAP's March 28, 2008 Broking Policy. Arguing that introduction of the e-mail would prejudice him, Bellantuono moved to preclude ICAP from introducing it into evidence. He also moved for a mistrial and sanctions against ICAP's counsel, asserting that "ICAP clearly attempted to influence the panel by describing documents that could not possibly have been admitted as evidence in this case." (App. 29). The Panel granted Bellantuono's motion to preclude the e-mail, but it denied his motion for a mistrial or sanctions. Bellantuono now contends that the Panel manifestly disregarded the law by "refus[ing] to hold [ICAP] accountable in any manner for its utterly improper conduct in failing to produce" the "highly damaging email . . . and then disclosing its contents" during the arbitration hearing. (Appellant's Br. at 29).

As Bellantuono concedes, his motion for a mistrial was governed by *Wymbs v. Twp. of Wayne,* 750 A.2d 751, 762 (N.J. 2000), where the New Jersey Supreme Court

13

held that trial courts enjoy "wide discretion in deciding the appropriate sanction for a breach of discovery rules," including with respect to a surprise witness or surprise testimony. *Id.* (internal quotation marks omitted). We agree with the District Court that Bellantuono's argument "amounts to nothing more than a disagreement with the [P]anel's application of *Wymbs*," which "is not the standard by which the Court may vacate an arbitration award." (App. 13).

### B. Refusal to Consider Pertinent and Material Evidence

Bellantuono also presents a challenge to the Panel's award on a ground specifically set forth in section 10 of the FAA: "misconduct . . . in refusing to hear evidence pertinent and material to the controversy . . . ." 9 U.S.C. § 10(a)(3). Bellantuono argues that the Panel's failure "to compel production of both the settlement communications between ICAP and the SEC and the Cleary Gottlieb investigation file" constitutes such misconduct. (Appellant's Br. at 33). He contends that vacatur is appropriate under Section 10(a)(3) because the Panel's misconduct deprived him of a fair hearing. Specifically, Bellantuono contends that the panel ignored material evidence because the documents would have allowed him to evaluate whether ICAP used his termination as a "bargaining chip in its negotiations for a lesser penalty or more favorable language in the settlement agreement and/or press release." (Appellant's Br. at 34).

In order for a court to vacate an arbitration award based on the arbitrator's "misconduct in refusing to hear evidence pertinent and material to the controversy[,]" 9 U.S.C. § 10(a)(3), the arbitrator's "error must be one that is not simply an error of law,

14

but which so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir. 1968). The Panel's rulings in this case did not deprive Bellantuono of a fair hearing. Indeed, the Panel granted Bellantuono broad leeway to pursue his position that ICAP used him as a bargaining chip in its negotiations with the SEC. Bellantuono's counsel questioned at least three different witnesses on that very issue, and he questioned several others on the language of a press release drafted by ICAP – which mentioned Bellantuono. The Panel simply refused to allow Bellantuono to search for evidence in documents that it found to be privileged or otherwise not discoverable. The Panel's rulings may indeed have been incorrect, and we may not agree with its exercise of discretion; nonetheless, even erroneous Panel rulings "hardly can be characterized as 'misconduct.'" *Century Indem. Co. v. Certain Underwriters at Lloyd's, London,* 584 F.3d 513, 557 (3d Cir. 2009).

## III.

For the foregoing reasons, we will affirm the judgment of the District Court.

15